The CHAMBERLAIN GROUP,
INC., Plaintiff–Appellant,

v.

SKYLINK TECHNOLOGIES, INC.,
Defendant–Appellee.

No. 04–1118.

United States Court of Appeals,
Federal Circuit.

DECIDED: Aug. 31, 2004.

Rehearing and Rehearing En Banc
Denied Oct. 22, 2004.

were John F. Flannery, Rudy I. Kratz and Michael G. Vranicar.

Richard de Bodo, Irell & Manella LLP, of Los Angeles, CA, argued for defendant-appellee. With him on the brief were Andra Barmash Greene, David Nimmer, Peter Christensen and David Djavaherian, of Newport Beach, CA.

Jonathan Band, Morrison & Foerster, LLP, of Washington, DC, for amicus curiae Computer & Communications Industry Association. With him on the brief was Matthew Schruers.

Jennifer M. Urban, Samuelson Law, Technology and Public Policy Clinic, University of California at Berkeley School of Law (Boalt Hall), of Berkeley, CA, for amicus curiae Consumers Union. With her on the brief was Jason M. Schultz, Electronic Frontier Foundation, of San Francisco, CA.

Before GAJARSA, LINN, and PROST, Circuit Judges.

GAJARSA, Circuit Judge.

The Chamberlain Group, Inc. ("Chamberlain") appeals the November 13, 2003 summary judgment of the United States District Court for the Northern District of Illinois ("District Court") in favor of Skylink Technologies, Inc. ("Skylink"), finding that Skylink is not violating the anti-trafficking provisions of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 et seq., and dismissing all other claims, including claims of patent infringement. *Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 292 F.Supp.2d 1040 (N.D.Ill.2003) (*"Chamberlain II"*). That same court, in an earlier ruling, denied Chamberlain's motion for summary judgment on its DMCA claims. *Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 292 F.Supp.2d 1023 (N.D.Ill.2003) (*"Chamberlain I"*). Chamberlain does not appeal

Karl R. Fink, Fitch, Even, Tabin & Flannery, of Chicago, Illinois, argued for plaintiff-appellant. With him on the brief

that denial of its summary judgment motion.

Chamberlain's claims at issue stem from its allegation that the District Court incorrectly construed the DMCA as placing a burden upon Chamberlain to prove that the circumvention of its technological measures enabled *unauthorized* access to its copyrighted software. But Skylink's accused device enables only uses that copyright law explicitly authorizes, and is therefore presumptively legal. Chamberlain has neither proved nor alleged a connection between Skylink's accused circumvention device and the protections that the copyright laws afford Chamberlain capable of overcoming that presumption. Chamberlain's failure to meet this burden alone compels a legal ruling in Skylink's favor. We therefore affirm the District Court's summary judgment in favor of Skylink.

## BACKGROUND

### A. *The Applicable Statute*

Chamberlain sued Skylink, alleging violations of the patent and copyright laws. Chamberlain's second amended complaint, dated March 26, 2003, enumerated eight causes of action against Skylink, including the infringement of three patents. The matter on appeal involves only Chamberlain's allegation that Skylink is violating the DMCA, specifically the anti-trafficking provision of § 1201(a)(2). The District Court first denied Chamberlain's motion for summary judgment of its DMCA claim, *Chamberlain I*, and then granted Skylink's motion for summary judgment on the DMCA claim. *Chamberlain II*. The District Court also dismissed all other counts.

The District Court's ruling, along with the appellate briefs that the parties and amici filed with this court, raise numerous provisions of the DMCA for our consideration. The key provisions at issue, however, are all in § 1201(a).

§ 1201. Circumvention of copyright protection systems

(a) Violations regarding circumvention of technological measures.

(1) (A) No person shall circumvent a technological measure that effectively controls access to a work protected under this title. . . .

(2) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

(3) As used in this subsection—

(A) to "circumvent a technological measure" means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner; and

(B) a technological measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment,

with the authority of the copyright owner, to gain access to the work.

17 U.S.C. § 1201(a).

## B. *The Dispute*

The District Court reviewed the basic facts and the underlying technology in its dismissal of Chamberlain's motion for summary judgment. Though the parties emphasize different aspects of the District Court's factual discussion, neither one questions its general accuracy.

The technology at issue involves Garage Door Openers (GDOs). A GDO typically consists of a hand-held portable transmitter and a garage door opening device mounted in a homeowner's garage. The opening device, in turn, includes both a receiver with associated signal processing software and a motor to open or close the garage door. In order to open or close the garage door, a user must activate the transmitter, which sends a radio frequency (RF) signal to the receiver located on the opening device. Once the opener receives a recognized signal, the signal processing software directs the motor to open or close the garage door.

When a homeowner purchases a GDO system, the manufacturer provides both an opener and a transmitter. Homeowners who desire replacement or spare transmitters can purchase them in the aftermarket. Aftermarket consumers have long been able to purchase "universal transmitters" that they can program to interoperate with their GDO system regardless of make or model. Skylink and Chamberlain are the only significant distributors of universal GDO transmitters.[1] Chamberlain places no explicit restrictions on the types of transmitter that the homeowner may use with its system at the time of purchase.

Chamberlain's customers therefore assume that they enjoy all of the rights associated with the use of their GDOs and any software embedded therein that the copyright laws and other laws of commerce provide.

This dispute involves Chamberlain's Security+ line of GDOs and Skylink's Model 39 universal transmitter. Chamberlain's Security+ GDOs incorporate a copyrighted "rolling code" computer program that constantly changes the transmitter signal needed to open the garage door. Skylink's Model 39 transmitter, which does not incorporate rolling code, nevertheless allows users to operate Security+ openers. Chamberlain alleges that Skylink's transmitter renders the Security+ insecure by allowing unauthorized users to circumvent the security inherent in rolling codes. Of greater legal significance, however, Chamberlain contends that because of this property of the Model 39, Skylink is in violation of the anti-trafficking clause of the DMCA's anticircumvention provisions, specifically § 1201(a)(2).

The code in a standard (i.e., non-rolling code) GDO transmitter is unique but fixed. Thus, according to Chamberlain, the typical GDO is vulnerable to attack by burglars who can open the garage door using a "code grabber." According to Chamberlain, code grabbers allow burglars in close proximity to a homeowner operating her garage door to record the signal sent from the transmitter to the opener, and to return later, replay the recorded signal, and open the garage door. Chamberlain concedes, however, that code grabbers are more theoretical than practical burgling devices; none of its witnesses had either firsthand knowledge of a single code grabbing problem or familiarity with data dem-

---

1. Chamberlain's product, the "Clicker," interoperates with both Chamberlain and non- Chamberlain GDOs.

onstrating the existence of a problem. Nevertheless, Chamberlain claims to have developed its rolling code system specifically to prevent code grabbing.[2]

The essence of the rolling code system is that the transmitted signals are broken into fixed and variable (or "rolling") components. The entire transmitted signal is a bit string. The fixed component serves to identify the transmitter. The rolling component cycles through a lengthy cycle of bit strings only some of which are capable of opening the door at any given time, ostensibly so that a burglar replaying a grabbed code is unlikely to send a valid signal—and therefore unlikely to open the garage door.

A user wishing to set up a new transmitter for use with her Security+ GDO must switch the opener to "program mode" and send a signal from the transmitter to the opener. The opener stores both the fixed and rolling components of the transmitted signal. When the user switches the opener back to "operate mode," the system is set and the user may operate the opener with the newly programmed transmitter. In Chamberlain's transmitter, a computer program increases the rolling code by a factor of three each time the user activates the transmitter. When the transmitted signal reaches the receiver, a program in the opener checks to see whether the rolling code received was identical to one of the most recently received 1,024 rolling codes (the "rear window"). If so, it will not activate the motor. If, on the other hand, the rolling code received is among the next 4,096 binary signals (the "forward window"), the receiver will activate the motor.

Not all recognized binary rolling signals are in either the forward or rear windows. If the transmitter sends a *single* signal outside of either window, the receiver will ignore it. If, however, the transmitter sends *two* signals outside either window in rapid succession, the opener will again access its programming, this time to determine whether the two signals together comprise a "resynchronization" sequence. If the signals differ by three, the receiver will reset the windows and activate the motor. According to Chamberlain, resynchronization accommodates the possibility that homeowners using the same transmitter for multiple residences may transmit so many signals while out of range of the opener that they exhaust the entire forward window.

Skylink began marketing and selling universal transmitters in 1992. Skylink designed its Model 39, launched in August 2002, to interoperate with common GDOs, including both rolling code and non-rolling code GDOs.[3] Although Chamberlain concedes that the Model 39 transmitter is capable of operating many different GDOs, it nevertheless asserts that Skylink markets the Model 39 transmitter for use in circumventing its copyrighted rolling code computer program. Chamberlain supports this allegation by pointing to the Model 39's setting that operates *only* Chamberlain's rolling code GDOs.

Skylink's Model 39 *does not* use rolling code technology. Like Chamberlain's products, however, the Model 39's binary signal contains two components. The first corresponds to the Chamberlain's fixed

---

2. According to Skylink, Chamberlain introduced rolling codes to prevent inadvertent GDO activation by planes passing overhead, not as a security measure.

3. The Model 39 interoperates with at least 15 different brands and dozens of different GDO models, only a few of which include Chamberlain's rolling code. One of the Model 39's settings interoperates *only* with Chamberlain rolling code GDOs.

component identifying the transmitter, and the second simulates the effect of the Chamberlain's rolling code. Like the Chamberlain fixed component, the primary role of the Model 39's identifying component is in programming; a homeowner wishing to use a Model 39 in conjunction with a Chamberlain GDO must program the opener to recognize his newly purchased transmitter. When the homeowner actually uses the transmitter, it broadcasts *three* fixed codes in rapid succession. The first binary signal combines the identifying component with an arbitrary binary sequence. The second binary signal subtracts 1800 from the first signal. The third signal adds three to the second signal. The combination of these three codes transmitted with every press of the Model 39 transmitter button will either cause the Chamberlain GDO to operate in response to the first fixed code or cause the GDO to resynchronize and operate in response to the second and third fixed codes. Chamberlain characterizes this procedure as a circumvention of an important security measure; a code grabber that recorded the Model 39's three codes could later play them back and activate a Chamberlain rolling code GDO without authorization.

These facts frame the dispute now before us on appeal. Though only Chamberlain's DMCA claim is before us, and though the parties dispute whether or not Skylink developed the Model 39 independent of Chamberlain's copyrighted products,[4] it is nevertheless noteworthy that Chamberlain *has not* alleged either that Skylink infringed its copyright or that

Skylink is liable for contributory copyright infringement. What Chamberlain *has* alleged is that because its opener and transmitter both incorporate computer programs "protected by copyright" and because rolling codes are a "technological measure" that "controls access" to those programs, Skylink is prima facie liable for violating § 1201(a)(2). In the District Court's words, "Chamberlain claims that the rolling code computer program has a protective measure that protects itself. Thus, only one computer program is at work here, but it has two functions: (1) to verify the rolling code; and (2) once the rolling code is verified, to activate the GDO motor, by sending instructions to a microprocessor in the GDO." *Chamberlain I*, 292 F.Supp.2d at 1028.

## C. *The Summary Judgment Motions*

The District Court first considered Chamberlain's motion for summary judgment on its DMCA claim. *Chamberlain I*. Chamberlain sued Skylink under 17 U.S.C. § 1201(a)(2), a statutory provision that neither the Seventh Circuit nor any previous District Court in the Seventh Circuit had ever considered. To date, in fact, only the Second Circuit has construed § 1201(a)(2), and that construction focused on First Amendment issues rather than on an application of the statute to case-specific facts. *See Universal City Studios v. Corley*, 273 F.3d 429 (2d Cir.2001) ("*Corley*"). The District Court therefore correctly viewed this case as a matter of first impression, and provided detailed analyses of

4. According to Chamberlain, the transmitter program is registered with the United States Copyright Office as No. TX5–533–065, and the computer program in the receiver is registered with the United States Copyright Office as No. TX5–549–995. The parties dispute whether the code used in the program is precisely the registered code or a slight varia-

tion thereof, possibly qualifying as a derivative work. Because this appeal is of a summary judgment favoring Skylink, however, we view all disputed facts in the light most favorable to Chamberlain, and therefore assume that all programs in question are fully protected by the copyright laws.

Chamberlain's various arguments and Skylink's proffered defenses.

At the end of this review, the District Court denied Chamberlain's motion for summary judgment. Chamberlain does not appeal this denial. The District Court, however, did refer back to its discussions numerous times in its consideration and grant of Skylink's motion for summary judgment, the subject of the current appeal. In fact, the District Court's discussion of Skylink's motion began by "assum[ing] the reader's familiarity with [its] earlier decision." *Chamberlain II*, 292 F.Supp.2d at 1042. Understanding the District Court's denial of Chamberlain's summary judgment motion is therefore critical to understanding its grant of Skylink's summary judgment motion.

Chamberlain's argument, submitted in both summary judgment motions, rests on its interpretation of the statute's "plain language." Chamberlain contends first, that Skylink "primarily designed or produced [the Model 39] for the purpose of circumventing [Chamberlain's rolling code] technological measure that effectively controls access to [Chamberlain's copyrighted computer programs]," contravening § 1201(a)(2)(A); second, that the Model 39 "has only limited commercially significant purpose or use other than to circumvent [Chamberlain's rolling code] technological measure that effectively controls access to

[Chamberlain's copyrighted computer programs]," contravening § 1201(a)(2)(B); and third, that Skylink marketed the Model 39 "for use in circumventing [Chamberlain's rolling code] technological measure that effectively controls access to [Chamberlain's copyrighted computer programs]," contravening § 1201(a)(2)(C). *Chamberlain I*, 292 F.Supp.2d at 1035.

Skylink submitted several defenses, arguing that: (1) the Model 39 transmitter serves a variety of functions that are unrelated to circumvention; (2) Chamberlain has failed to demonstrate that its GDOs contain a computer program protected by copyright; (3) consumers use the Model 39 transmitter to activate the Security+ GDOs with Chamberlain's consent; (4) Skylink has not violated the DMCA because it falls within a safe harbor provision per § 1201(f);[5] and (5) Chamberlain's rolling code computer program does not protect a copyrighted computer program, but instead protects an uncopyrightable process. *Id.* at 1035–36. Though the District Court commented on all of these arguments, it based its rulings entirely on Skylink's third argument concerning authorization and consent.

Chamberlain submitted two arguments in response to Skylink's assertion that Chamberlain authorized its customers to use the Model 39. First, Chamberlain argued that Skylink bore the burden of prov-

---

**5.** § 1201. Circumvention of copyright protection systems ...

(f) Reverse engineering.

(1) Notwithstanding the provisions of subsection (a)(1)(A), a person who has lawfully obtained the right to use a copy of a computer program may circumvent a technological measure that effectively controls access to a particular portion of that program for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs ... to the

extent any such acts of identification and analysis do not constitute infringement under this title ....

(4) For purposes of this subsection, the term "interoperability" means the ability of computer programs to exchange information, and of such programs mutually to use the information which has been exchanged. 17 U.S.C. § 1201(f). Computer and Communications Industry Association (CCIA), first as an amicus to the District Court and now as an amicus to this court, submitted § 1201(f) as an alternative basis for finding in favor of Skylink.

ing that its behavior was authorized, and that Skylink's argument was therefore, at best, an affirmative defense rather than a defect in its own pleadings. *Chamberlain II*, 292 F.Supp.2d at 1044. Second, Chamberlain noted that it never gave consumers *explicit* authorization to program competing universal transmitters into its rolling code openers, at least in part because it never anticipated that any competitor would crack its code. Skylink did not dispute this point, but asserted simply that in the absence of an explicit restriction, consumers must be free to infer that they have purchased the full range of rights that normally accompany consumer products—including those containing copyrighted embedded software.

In assessing the authorization issue, the District Court noted that according to the statute's internal definitions, "circumvent a technological measure" means to "descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, *without the authority of the copyright owner.*" *Id.* at 1043 (citing 17 U.S.C. § 1201(a)(3)(A)) (emphasis added by the District Court).

According to undisputed facts, a homeowner who purchases a Chamberlain GDO owns it and has a right to use it to access his or her own garage. At the time of sale, Chamberlain does not place any explicit terms or condition on use to limit the ways that a purchaser may use its products. A homeowner who wishes to use a Model 39 must first program it into the GDO. Skylink characterizes this action as the homeowner's authorization of the Model 39 to interoperate with the GDO. In other words, according to Skylink, Chamberlain GDO consumers who purchase a Skylink transmitter have Chamberlain's implicit permission to purchase and to use any brand of transmitter that will open

their GDO. The District Court agreed that Chamberlain's unconditioned sale implied authorization. *Id.*

Chamberlain also argued that its web page and warranty implied restrictions on the use of competing transmitters. The District Court, however, refused to read an implicit restriction from the mere absence of competing products discussed on Chamberlain's web page, particularly given the longstanding industry practice of marketing universal transmitters. The District Court rejected the alleged implications of Chamberlain's warranties even more strongly, noting that consumers are always free to forego the benefits of a product's warranty and to use consumer products in any way that they choose. The District Court similarly rejected Chamberlain's reiteration of the arguments that had proved unpersuasive in its own summary judgment motion to defend itself against Skylink's summary judgment motion.

The District Court further noted that under Chamberlain's proposed construction of the DMCA, not only would Skylink be in violation of § 1201(a)(2) (prohibiting trafficking in circumvention devices), but Chamberlain's own customers who used a Model 39 would be in violation of § 1201(a)(1) (prohibiting circumvention). The District Court declined to adopt a construction with such dire implications. *See Chamberlain I*, 292 F.Supp.2d at 1039–40.

In short, the District Court concluded that because Chamberlain never restricted its customers' use of competing transmitters with its Security+ line, those customers had implicit authorization to use Skylink's Model 39. Because of that implicit authorization, Chamberlain could not possibly meet its burden of proving that Skylink trafficked in a device designed to circumvent a technological measure to gain unauthorized access to Chamberlain's

copyrighted computer programs. The District Court therefore granted Skylink's motion for summary judgment on Chamberlain's DMCA claim. Chamberlain timely appealed only the District Court's final judgment in favor of Skylink on Chamberlain's DMCA claim, not the District Court's denial of its own summary judgment motion.

## DISCUSSION

### A. Jurisdiction

■ Though we have jurisdiction to hear this appeal under 28 U.S.C. § 1295(a)(1), that finding rests upon a detailed jurisdictional inquiry. Chamberlain's initial complaint described "an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 271 et seq. and for copyright infringement arising under the Copyright Act, 17 U.S.C. § 1201." The complaint stated four counts; three involved infringement of Chamberlain patents. Subsequent amendments to the complaint added four more non-patent claims. There is therefore little doubt that, both as filed and as amended, the District Court's jurisdiction "arose under" the patent laws, at least in part.

■ Chamberlain argues, with some justification, that this characterization of its complaint alone is enough to confer appellate jurisdiction on this court. According to Chamberlain, the Supreme Court's emphasis of the well-pleaded complaint rule in determining our jurisdiction requires us to inquire *only* whether the District Court's jurisdiction "arose under" the patent laws, at least in part. *See Holmes Group v. Vornado Air Circulation*

*Sys.*, 535 U.S. 826, 829, 122 S.Ct. 1889, 153 L.Ed.2d 13 (2002). Skylink does not dispute this point. Nevertheless, "[e]very federal appellate court has a special obligation to satisfy itself . . . of its own jurisdiction . . . even though the parties are prepared to concede it." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (citations omitted). Though both our precedent and the Supreme Court's dicta concerning cases, such as this one, where all patent issues were dismissed and only non-patent issues are on appeal, support our jurisdiction, the determination is not as clear cut as Chamberlain contends—in part because of the unusual language that the District Court used in dismissing the claims other than Count III, the DMCA claim that is the subject of this appeal.

The District Court first dismissed one of Chamberlain's patent claims, Count II, "without prejudice to Plaintiff's reasserting its '703 patent claims if the Federal Circuit reverses Judge Conlon's decision in *Chamberlain Group, Inc. v. Interlogix, Inc.*, No. 01 C6157." Chamberlain and Interlogix settled their case while it was on appeal. This court then remanded the matter for "the purpose of allowing the District Court to consider the parties' motion to vacate its judgment." *Chamberlain Group, Inc. v. Interlogix, Inc.*, 75 Fed.Appx. 786 (Fed.Cir.2003).[6] Though the *Interlogix* trial court subsequently denied that motion, *Chamberlain Group, Inc. v. Interlogix, Inc.*, No. 01–C6157, 2004 WL 1197258, 2004 U.S. Dist. LEXIS 9851 (N.D.Ill., May 28, 2004), that denial in no way disturbed the settlement. As a result, there is no longer any set of circumstances

---

**6.** Unpublished opinions of the Federal Circuit may not be cited as precedent, but are nevertheless binding on the parties. Because of the wording of the District Court's dismissal, this particular unpublished opinion is critical to determining the status of Count II in the present matter.

under which this court could "reverse Judge Conlon's decision." Chamberlain can no longer reassert Count II in any forum. The District Court's dismissal of Count II, though styled as "without prejudice subject to a condition subsequent," has ripened into a dismissal with prejudice, and therefore serves as an adjudication on the merits of Count II.

The District Court's effective adjudication of Count II confirmed Federal Circuit jurisdiction to hear all appeals from the final judgment in this matter, 28 U.S.C. § 1295(a)(1), by assuring that the District Court's own jurisdiction arose in part under the patent laws. *See Holmes,* 535 U.S. at 826, 122 S.Ct. 1889. At the time that the District Court dismissed Count II, however, numerous other claims and counterclaims remained unresolved. Shortly thereafter, though, and subject to stipulation by the parties, the District Court dismissed all remaining claims other than Count III, the DMCA claim:

> Counts IV through VII of the Second Amended Complaint and Counts I through VII of the Amended Answer and Counterclaim are dismissed with prejudice pursuant to Fed.R.Civ.P. 41(a). Counts I and VIII of the Second Amended Complaint are dismissed without prejudice pursuant to Fed.R.Civ.P. 41(a). The dismissal of the patent claims is without prejudice solely for the purpose of permitting the maintenance of the patent claims in the ITC investigation and nowhere else as per agreement of the parties.[7]

Counts I, II, and VIII were the only patent claims in the Second Amended Com-

plaint. This broad dismissal rendered the District Court's summary judgment for Skylink on the DMCA claim a final judgment from which Chamberlain could appeal.

■ Though we have never before had to consider our jurisdiction over matters in which a trial court dismissed all patent claims using precisely the language that this District Court did in dismissing Claims I, II, and VIII, our precedent is clear. Federal Circuit jurisdiction depends on whether the plaintiff's complaint as amended raises patent law issues. *Gronholz v. Sears, Roebuck & Co.,* 836 F.2d 515, 519 (Fed.Cir.1987); *see also Holmes,* 535 U.S. at 829 n. 1, 122 S.Ct. 1889; *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 822–24, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (Stevens, J., concurring); *Holmes,* 535 U.S. at 835, 122 S.Ct. 1889 (Stevens, J., concurring). Where, as here, all of the patent claims in the amended complaint were dismissed prior to the non-patent ruling on appeal, the dispositive question is whether the dismissal was with or without prejudice. *Nilssen v. Motorola, Inc.,* 203 F.3d 782, 785 (Fed.Cir.2000).

■ Dismissals *without prejudice* are de facto amendments to the complaint. *Gronholz,* 836 F.2d at 519. For the purposes of determining Federal Circuit jurisdiction, we do not differentiate between actual and constructive amendments; both divest us of jurisdiction if they eliminate all issues of patent law. *See id.* Dismissals *with prejudice* are adjudications on the merits, and not constructive amendments

**7.** According to the District Court, Chamberlain also argued that it never authorized its customers to use Model 39 transmitters in a separate action in front of the International Trade Commission ("ITC"). *In the Matter of Certain Universal Transmitters for Garage Door Openers ("Matter of GDOs"),* Inv. No. 337–TA–497, 2003 WL, slip op. at 39, 41–42 (Nov. 4, 2003). The ITC's Administrative Law Judge rejected the argument. *See Chamberlain II,* 292 F.Supp.2d at 1044–45. That matter is the subject of a separate appeal still pending.

to the complaint. *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1346 (Fed.Cir. 1999). In all such cases, we retain jurisdiction to hear all appeals on all issues. *See id.*

Taken together, whenever the complaint included a patent claim and the trial court's rulings altered the legal status of the parties with respect to that patent claim, we retain appellate jurisdiction over all pendent claims in the complaint. *See Atari, Inc. v. JS & A Group, Inc.*, 747 F.2d 1422, 1432 (Fed.Cir.1984) (en banc) overruled on other grounds by, *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed.Cir.1998) *(en banc in relevant part); Zenith*, 182 F.3d at 1346; *Nilssen*, 203 F.3d at 785. In other words, if all patent claims raised in the amended complaint were dismissed *without prejudice*, the dismissal would divest us of jurisdiction; dismissals *with prejudice* would not. *Nilssen*, 203 F.3d at 785. Neither the specific rule under which the District Court dismissed the claims nor the wording of the dismissal alters the fundamental basis of our jurisdiction. *Id.* Dismissals divest this court of jurisdiction only if "[t]he parties were left in the same legal position with respect to [all] patent claims as if they had never been filed." *Id.* "[T]he dismissal of a claim with prejudice operate[s] as an adjudication of that claim on the merits," *id.*, and preserves our jurisdiction.

Our jurisdiction in the present matter therefore hinges on whether one or more of the District Court's dismissals altered the legal positions of Chamberlain and Skylink vis-à-vis the dismissed claim. The Supreme Court has defined the difference between dismissals with and without prejudice:

> The primary meaning of "dismissal without prejudice," we think, is dismissal without barring the defendant from re-

turning later, to the same court, with the same underlying claim. That will also ordinarily (though not always) have the consequence of not barring the claim from *other* courts, but its primary meaning relates to the dismissing court itself. Thus, Black's Law Dictionary (7th ed.1999) defines "dismissed without prejudice" as "removed from the court's docket in such a way that the plaintiff may refile the same suit on the same claim," *id.* at 482, and defines "dismissal without prejudice" as "[a] dismissal that does not bar the plaintiff from refiling the lawsuit within the applicable limitations period, *ibid.*"

*Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505–06, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001). This distinction is functional, rather than semantic. Notwithstanding the District Court's semantic characterization of its dismissal of Claim II as "without prejudice" subject to a condition subsequent that can no longer occur, and of Claims I and VIII as "without prejudice" except in a single forum, Chamberlain *is* barred from reasserting these claims. The District Court's dismissals clearly fail to meet the Supreme Court's definition of "dismissal without prejudice" because they alter the legal status of the parties vis-à-vis *all* of Chamberlain's asserted patent claims. Chamberlain and Skylink were *not* "left in the same legal position with respect to the patent claims as if they had never been filed." *Nilssen*, 203 F.3d at 785. We therefore have jurisdiction to hear this appeal under 28 U.S.C. § 1295(a)(1).

## B. *The Parties' Positions*

On appeal, the parties have raised a number of issues that we must address both as matters of statutory construction and as they relate to the factual disposition of this case. Chamberlain argues that

"Skylink violates the prima facie requirement of anti-trafficking § 1201(a)(2)." According to Chamberlain, "Skylink did not seriously dispute that the operation of its transmitters bypasses Chamberlain's rolling code security measure to gain access to Chamberlain's copyrighted GDO receiver operating software, but instead focuses on an 'authorization' defense." Given that "plain language" interpretation of the statute, Chamberlain also argues that the District Court erred in assigning the plaintiff the burden of proving that access was unauthorized rather than placing the burden on the defendant to prove that the access was authorized. Finally, with the burden thus shifted, Chamberlain argues that Skylink has not met its burden, and that the District Court's grant of summary judgment was therefore in error.

Skylink primarily urges us to adopt both the District Court's construction and its application of its construction to the facts of this case. In particular, Skylink urges us *not* to place the burden of proving authorization on defendants, arguing that it would be tantamount to reading a new "authority" requirement into the DMCA.[8] To resolve this dispute, we must first construe the relevant portions of the DMCA, and then apply the statute, properly construed, to the specific facts at issue.

### C. Standard of Review

■ To resolve issues of substantive copyright law, this court applies the law as interpreted by the regional circuits, in this case the Seventh Circuit. *See Atari Games Corp. v. Nintendo of Am., Inc.*, 975 F.2d 832, 837 (Fed.Cir.1992). Because this matter came to us following a summary judgment, we must apply the Seventh Circuit's standard of review for summary judgments. This standard does not differ from circuit to circuit. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Appellate courts review summary judgment motions de novo, viewing the record and all inferences from it in the light most favorable to the nonmoving party. *Schmidt v. Ottawa Med. Ctr., P.C.*, 322 F.3d 461, 463 (7th Cir.2003). Summary judgment is appropriate only when there is no genuine issue as to any material fact and where the moving party is entitled to judgment as a matter of law. *Id.*

Our task is essentially one of statutory construction. It is also a matter of first impression. For us to determine whether or not Skylink was entitled to summary judgment that its Model 39 universal transmitter does not violate the DMCA, we must first determine precisely what § 1201(a)(2) prohibits. The Seventh Circuit has considered the DMCA only once, in *In re Aimster Copyright Litigation*, 334 F.3d 643, 655 (7th Cir.2003). That case involved provisions of the DMCA other than those at issue here. To the extent

---

**8.** Two amici urging us to affirm raised additional arguments that warrant mention. Amicus Computer and Communications Industry Association (CCIA) urges us to consider the import of 1201(f), which explicitly allows circumvention for the purposes of achieving interoperability. Amicus Consumers Union (CU) urges us to consider the policy implications of Chamberlains proposed construction to consumers and to aftermarket competitors. According to CU, Chamberlains proposed construction of the DMCA would enable copyright owners to engage in a number of practices that would otherwise be considered copyright misuse, an antitrust violation, or a violation of state unfair competition laws. At oral argument, Chamberlain conceded that its proposed construction would, indeed, alter virtually all existing consumer expectations concerning the publics rights to use purchased products containing copyrighted software protected by a technological measure—effectively confirming CUs fears.

that the Seventh Circuit provided any useful guidance to our consideration of the DMCA, it can be captured in two simple sentences: "The DMCA is an attempt to deal with special problems created by the so-called digital revolution.... The Act does not abolish contributory infringement." *Id.* As a result, there is no binding precedent governing the substantive issues in this case. The parties have provided numerous citations to persuasive authority from other regional circuits and from District Courts, primarily but not exclusively *Universal City Studios, Inc. v. Reimerdes,* 111 F.Supp.2d 294, 319 (S.D.N.Y.2000) ("Reimerdes"), *affd sub nom. Universal City Studios v. Corley,* 273 F.3d 429 (2d Cir.2001) ("*Corley*").[9] The parties pointed the District Court toward this case as well, and the District Court relied in part upon the *Reimerdes* analysis in its own construction of the DMCA. *See Chamberlain I,* 292 F.Supp.2d at 1036–40; *Chamberlain II,* 292 F.Supp.2d at 1045.

The general methodology guiding a court's construction of a statute is well established, and is the same in the Seventh Circuit as it is in the Federal Circuit. *Compare Bethlehem Steel Corp. v. Bush,* 918 F.2d 1323, 1327 (7th Cir. 1990), *with Madison Galleries, Ltd. v. United States,* 870 F.2d 627, 630 (Fed.Cir. 1989). We must start with the language of the statute. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.,* 484 U.S. 49, 56, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). If the statute is unambiguous, our inquiry is at an end; we must enforce the congressional intent embodied in that plain wording. *See United States v. Clark,* 454 U.S. 555, 560, 102 S.Ct. 805, 70 L.Ed.2d 768 (1982). "When a syntactical analysis of the statutory language does not yield a

satisfactory answer with respect to the intent of the Congress, we must employ other less satisfactory means to ascertain, as best we can, the legislative will." *Bethlehem Steel,* 918 F.2d at 1327. In such cases, investigations of the statute's structure and of relevant legislative history can both provide useful insights to help us construe the statute in the way most consistent with congressional intent. *See, e.g., Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 490, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001); *Boim v. Quranic Literacy Inst.,* 291 F.3d 1000, 1019 (7th Cir.2002). "Policy considerations cannot override our interpretation of the text and structure of [a statute], except to the extent that they may help to show that adherence to the text and structure would lead to a result so bizarre that Congress could not have intended it." *Central Bank, N.A. v. First Interstate Bank, N.A.,* 511 U.S. 164, 188, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

### D. *The Statute and Liability under the DMCA*

The essence of the DMCA's anticircumvention provisions is that §§ 1201(a),(b) establish causes of action for liability. They do not establish a new property right. The DMCA's text indicates that circumvention is not infringement, 17 U.S.C. § 1201(c)(1) ("Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title."), and the statute's structure makes the point even clearer. This distinction between property and liability is critical. Whereas copyrights, like patents, are property, liability protection from unautho-

---

9. Both parties relied on the trial court's decision in this case, rather than the Second Circuit's decision, presumably because the trial court, but not the Court of Appeals, addressed § 1201(a)(2)(A).

rized circumvention merely creates a new cause of action under which a defendant may be liable. The distinction between property and liability goes straight to the issue of authorization, the issue upon which the District Court both denied Chamberlain's and granted Skylink's motion for summary judgment.

 A plaintiff alleging copyright infringement need prove *only* "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Pub., Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *see also Harris Custom Builders, Inc. v. Hoffmeyer,* 92 F.3d 517, 519 (7th Cir.1996). "[T]he existence of a license, exclusive or nonexclusive, creates an affirmative defense to a claim of copyright infringement." *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 775 (7th Cir. 1996). In other words, under Seventh Circuit copyright law, a plaintiff only needs to show that the defendant has used her property; the burden of proving that the use was authorized falls squarely on the defendant. *Id.* The DMCA, however, *defines* circumvention as an activity undertaken "without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). The plain language of the statute therefore requires a plaintiff alleging circumvention (or trafficking) to prove that the defendant's access was unauthorized—a significant burden where, as here, the copyright laws authorize consumers to use the copy of Chamberlain's software embedded in the GDOs that they purchased. The premise underlying this initial assignment of burden is that the copyright laws authorize members of the public to access a work, but not to copy it. The law therefore places the burden of proof on the party attempting to establish that the circumstances of its case deviate from these normal expectations; defendants must prove authorized copying and plaintiffs must prove unauthorized access.

The distinction between property and liability also addresses an important policy issue that Chamberlain puts into stark focus.[10] According to Chamberlain, the 1998 enactment of the DMCA "renders the pre-DMCA history in the GDO industry irrelevant. By prohibiting the trafficking and use of circumvention technology, the DMCA fundamentally altered the legal landscape.... Any analysis of practices within the GDO industry must now be undertaken in light of the DMCA." Chamberlain reiterated and strengthened this assertion at oral argument, claiming that the DMCA overrode all pre-existing consumer expectations about the legitimate uses of products containing copyrighted embedded software. Chamberlain contends that Congress empowered manufacturers to prohibit consumers from using embedded software products in conjunction with competing products when it passed § 1201(a)(1). According to Chamberlain, *all* such uses of products containing copyrighted software to which a technological measure controlled access are now per se illegal under the DMCA unless the manufacturer provided consumers with *explicit* authorization. Chamberlain's interpretation of the DMCA would therefore grant manufacturers broad exemptions from both the antitrust laws and the doctrine of copyright misuse.

 Such an exemption, however, is only plausible if the anticircumvention provisions established a new property right capable of conflicting with the copyright owner's other legal responsibilities—which as we have already explained, they do not. The anticircumvention provisions convey no additional property rights in and

10. Amicus CU also raised this issue in its brief to this court.

of themselves; they simply provide property owners with new ways to secure their property. Like all property owners taking legitimate steps to protect their property, however, copyright owners relying on the anticircumvention provisions remain bound by all other relevant bodies of law. Contrary to Chamberlain's assertion, the DMCA emphatically *did not* "fundamentally alter" the legal landscape governing the reasonable expectations of consumers or competitors; *did not* "fundamentally alter" the ways that courts analyze industry practices; and *did not* render the pre-DMCA history of the GDO industry irrelevant.

■ What the DMCA did was introduce new grounds for liability in the context of the unauthorized access of copyrighted material. The statute's plain language requires plaintiffs to prove that those circumventing their technological measures controlling access did so "without the authority of the copyright owner." 17 U.S.C. § 1201(3)(A). Our inquiry ends with that clear language. We note, however, that the statute's structure, legislative history, and context within the Copyright Act all support our construction. They also help to explain why Chamberlain's warranty conditions and website postings cannot render users of Skylink's Model 39 "unauthorized" users for the purposes of establishing trafficking liability under the DMCA.

### E. *Statutory Structure and Legislative History*

The specific statutory provision here at issue is § 1201(a)(2) of the DMCA. The structure of the DMCA follows logically from the textual provisions distinguishing circumvention from infringement. The

provisions relevant to circumvention are all in a new chapter of the Copyright Act, Chapter 12, titled "Copyright Protection and Management System." Violators may be subject to the new civil penalties of § 1203 and the criminal penalties of § 1204, but they are not necessarily liable for copyright infringement.

The Second Circuit, as a precursor to its constitutional analysis, summarized the statute's history and structure:

> The DMCA was enacted in 1998 to implement the World Intellectual Property Organization Copyright Treaty (WIPO Treaty), which requires contracting parties to provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors in connection with the exercise of their rights under this Treaty or the Berne Convention and that restrict acts, in respect of their works, which are not authorized by the authors concerned or permitted by law.[11] Even before the treaty, Congress had been devoting attention to the problems faced by copyright enforcement in the digital age. Hearings on the topic have spanned several years.... This legislative effort resulted in the DMCA.
>
> The Act contains three provisions targeted at the circumvention of technological protections. The first is subsection 1201(a)(1)(A), the anticircumvention provision. This provision prohibits a person from circumvent[ing] a technological measure that effectively controls access to a work protected under [Title 17, governing copyright]....
>
> The second and third provisions are subsections 1201(a)(2) and 1201(b)(1),

11. WIPO Treaty, Apr. 12, 1997, art. 11, S. Treaty Doc. No. 105–17 (1997), *available at* 1997 WL 447232.

the anti-trafficking provisions.... Subsection 1201(a)(1) differs from both of these anti-trafficking subsections in that it targets the use of a circumvention technology, not the trafficking in such a technology.

The DMCA contains exceptions, ... [*id.* 1201(d),(f),(g)] ... creates civil remedies, *id.* 1203, and criminal sanctions, *id.* 1204. It specifically authorizes a court to grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation. *Id.* 1203(b)(1).

*Corley,* 273 F.3d at 440–41 (footnote appears as text in original; internal footnotes from original omitted).

Here, as in *Corley,* the primary statutory clause at issue is § 1201(a)(2) of the DMCA, though other subsections of § 1201 are also implicated. Unlike the Second Circuit in *Corley,* which provided only enough of the statutory construction to address constitutional challenges, however, we must construe the full boundaries of anticircumvention and anti-trafficking liability under the DMCA. We must determine the Congressional intent embodied in the statute's language, and then enforce the correctly construed statute to the facts at hand. *See United States v. Clark,* 454 U.S. 555, 560, 102 S.Ct. 805, 70 L.Ed.2d 768 (1982).

Because the DMCA is a complex statute creating several new causes of action, each subject to numerous exceptions, we must also ensure that our construction makes sense given the statute's entirety. We must therefore consider briefly the relationship among the liabilities created under §§ 1201(a)(1), (a)(2), and (b). Statutory structure and legislative history both make it clear that § 1201 applies only to

circumventions reasonably related to protected rights. Defendants who traffic in devices that circumvent access controls in ways that facilitate infringement may be subject to liability under § 1201(a)(2). Defendants who use such devices may be subject to liability under § 1201(a)(1) whether they infringe or not. Because all defendants who traffic in devices that circumvent rights controls necessarily facilitate infringement, they may be subject to liability under § 1201(b). Defendants who use such devices may be subject to liability for copyright infringement. And finally, defendants whose circumvention devices do not facilitate infringement are not subject to § 1201 liability.

The key to understanding this relationship lies in § 1201(b),[12] which prohibits trafficking in devices that circumvent technological measures tailored narrowly to protect an individual right of the copyright owner while nevertheless allowing access to the protected work. Though § 1201(b) parallels the anti-trafficking ban of § 1201(a)(2), there is no narrowly tailored ban on direct circumvention to parallel § 1201(a)(1). This omission was intentional.

> The prohibition in 1201(a)(1) [was] necessary because prior to [the DMCA], the conduct of circumvention was never before made unlawful. The device limitation in 1201(a)(2) enforces this new prohibition in conduct. The copyright law has long forbidden copyright infringements, so no new prohibition was necessary. The device limitation in 1201(b) enforces the longstanding prohibitions on infringements.

S.Rep. No. 105–90 at 12 (1998).

Prior to the DMCA, a copyright owner would have had no cause of action against

---

**12.** "No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that ... [circumvents] a technological measure that effectively protects *a right of a copyright owner* under this title in a work or a portion thereof." 35 U.S.C. § 1201(b)(1) (emphasis added).

anyone who circumvented any sort of technological control, but did not infringe. The DMCA rebalanced these interests to favor the copyright owner; the DMCA created circumvention liability for "digital trespass" under § 1201(a)(1). It also created trafficking liability under § 1201(a)(2) for facilitating such circumvention and under § 1201(b) for facilitating infringement (both subject to the numerous limitations and exceptions outlined throughout the DMCA).[13]

The importance of "rebalancing" interests in light of recent technological advances is manifest in the DMCA's legislative history. Though the Supreme Court has recognized that interim industrial developments may erode the "persuasive effect of legislative history," *New York v. FERC,* 535 U.S. 1, 23, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002), Congressional intent evident in relatively recent legislation like the DMCA may provide useful context in interpreting the statutory language. Though "we do not resort to legislative history to cloud a statutory text that is clear," *Ratzlaf v. United States,* 510 U.S. 135, 147–48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), we nevertheless recognize that "words are inexact tools at best, and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history." *Tidewater Oil Co. v. United States,* 409 U.S. 151, 157, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972).

■ The most significant and consistent theme running through the entire legislative history of the anticircumvention and anti-trafficking provisions of the DMCA, §§ 1201(a)(1),(2), is that Congress

attempted to balance competing interests, and "endeavored to specify, with as much clarity as possible, how the right against anti-circumvention would be qualified to maintain balance between the interests of content creators and information users." H.R.Rep. No. 105–551, at 26 (1998). The Report of the House Commerce Committee concluded that § 1201 "fully respects and extends into the digital environment the bedrock principle of 'balance' in American intellectual property law for the benefit of both copyright owners and users." *Id.*

The crux of the present dispute over statutory construction therefore stems from a dispute over the precise balance between copyright owners and users that Congress captured in the DMCA's language.

> Defendants argue ... that the DMCA should not be construed to reach their conduct [or product] ... because the DMCA, so applied, could prevent those who wish to gain access to technologically protected copyrighted works in order to make ... non-infringing use of them from doing so.... Technological access control measures have the capacity to prevent fair uses of copyrighted works as well as foul. Hence, there is a potential tension between the use of such access control measures and fair use, [as well as the much broader range of explicitly noninfringing use].... As the DMCA made its way through the legislative process, Congress was preoccupied with precisely this issue. Proponents of strong restrictions on circumvention of access control measures argued that they were

---

**13.** For obvious reasons, § 1201(a)(2) trafficking liability cannot exist in the absence of § 1201(a)(1) violations—much as this court has often explained that "indirect [patent] infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement, though the direct infringer is typically someone other than the defendant accused of indirect infringement." *Dynacore Holdings Corp. v. U.S. Philips Corp.,* 363 F.3d 1263, 1272 (Fed.Cir. 2004).

essential if copyright holders were to make their works available in digital form because digital works otherwise could be pirated too easily. Opponents contended that strong anticircumvention measures would extend the copyright monopoly inappropriately and prevent many fair uses of copyrighted material. Congress struck a balance....

*Reimerdes,* 111 F.Supp.2d at 304 (citations omitted). We must understand that balance to resolve this dispute.

### F. *Access and Protection*

Congress crafted the new anticircumvention and anti-trafficking provisions here at issue to help bring copyright law into the information age. Advances in digital technology over the past few decades have stripped copyright owners of much of the technological and economic protection to which they had grown accustomed. Whereas large-scale copying and distribution of copyrighted material used to be difficult and expensive, it is now easy and inexpensive. The *Reimerdes* court correctly noted both the economic impact of these advances and their consequent potential impact on innovation. Congress therefore crafted legislation restricting some, but not all, technological measures designed either to access a work protected by copyright, § 1201(a), or to infringe a right of a copyright owner, § 1201(b).

Though as noted, circumvention *is not* a new form of infringement but rather a new violation prohibiting actions or products that facilitate infringement, it is significant that virtually every clause of § 1201 that mentions "access" links "access" to "protection." The import of that linkage may be less than obvious. Perhaps the best way to appreciate the necessity of this linkage—and the disposition of this case— is to consider three interrelated questions

inherent in the DMCA's structure: What does § 1201(a)(2) prohibit above and beyond the prohibitions of § 1201(b)? What is the relationship between the sorts of "access" prohibited under § 1201(a) and the rights "protected" under the Copyright Act? and What is the relationship between anticircumvention liability under § 1201(a)(1) and anti-trafficking liability under § 1201(a)(2)? The relationships among the new liabilities that these three provisions, §§ 1201(a)(1),(a)(2),(b), create circumscribe the DMCA's scope—and therefore allow us to determine whether or not Chamberlain's claim falls within its purview. And the key to disentangling these relationships lies in understanding the linkage between access and protection.

Chamberlain urges us to read the DMCA as if Congress simply created a new protection for copyrighted works without any reference at all either to the protections that copyright owners already possess or to the rights that the Copyright Act grants to the public. Chamberlain has not alleged that Skylink's Model 39 infringes its copyrights, nor has it alleged that the Model 39 contributes to third-party infringement of its copyrights. Chamberlain's allegation is considerably more straightforward: The only way for the Model 39 to interoperate with a Security+ GDO is by "accessing" copyrighted software. Skylink has therefore committed a per se violation of the DMCA. Chamberlain urges us to conclude that no necessary connection exists between access and *copyrights.* Congress could not have intended such a broad reading of the DMCA. *Accord Corley,* 273 F.3d at 435 (explaining that Congress passed the DMCA's anti-trafficking provisions to help copyright owners protect their works *from piracy* behind a digital wall).

Chamberlain derives its strongest claimed support for its proposed construc-

tion from the trial court's opinion in *Reimerdes,* a case involving the same statutory provision. *See Reimerdes,* 111 F.Supp.2d at 304. Though Chamberlain is correct in considering some of the *Reimerdes* language supportive, it is the differences between the cases, rather than their similarities, that is most · instructive in demonstrating precisely what the DMCA permits and what it prohibits.

The facts here differ greatly from those in *Reimerdes.* There, a group of movie studios sought an injunction under· the DMCA to prohibit illegal copying of digital versatile discs (DVDs). *Reimerdes,* 111 F.Supp.2d at 308. The plaintiffs presented evidence that each motion picture DVD includes a content scrambling system (CSS) that permits the film to be played, but not copied, using DVD players that incorporate the plaintiffs' licensed decryption technology. *Id.* The defendant provided a link on his website that allowed an individual to download DeCSS, a program that allows the user to circumvent the CSS protective system and to view *or to copy* a motion. picture from a DVD, whether or not the user has a DVD player with the licensed technology. *Id.* The defendant proudly trumpeted his actions as "electronic civil disobedience.". *Id.* at 303, 312. The court found that the defendant had violated 17 U.S.C. § 1201(a)(2)(A) because DeCSS had only one purpose: to decrypt CSS. *Id.* at 319, 346.

Chamberlain's proposed ·construction of the DMCA ignores the significant differences between defendants whose accused products enable copying and those, like Skylink, whose accused products enable only legitimate uses of copyrighted software. Chamberlain's repeated reliance on language targeted at defendants trumpeting their "electronic civil disobedience," *id.* at 303, 312, apparently led it to misconstrue significant portions of the DMCA.

Many of Chamberlain's assertions in its brief to this court conflate the property right of copyright with the liability that the anticircumvention provisions impose.

Chamberlain relies upon the DMCA's prohibition of "fair uses ... as well as foul," *Reimerdes,* 111 F.Supp.2d at 304, to argue that the enactment of the DMCA eliminated all éxisting consumer expectations about the public's rights to use purchased products because those products might include technological measures controlling access to a copyrighted work. But Chamberlain appears to have overlooked the obvious. The possibility that § 1201 might prohibit some otherwise noninfringing public uses of copyrighted material, *see, e.g. RealNetworks, Inc. v. Streambox, Inc.,* No. 2:99CV02070, 2000 WL 127311, at *8, 2000 U.S. Dist. LEXIS 1889, at *23, (W.D.Wash., Jan.18, 2000); *Reimerdes,* 111 F.Supp.2d at 323, arises simply because the Congressional decision to create liability and consequent damages for making, using, or selling a "key" that essentially enables a *trespass* upon intellectual property need not be identical in scope to the liabilities and compensable ·damages for *infringing* that property; it is, instead, a rebalancing of interests that "attempt[s] to deal with special problems created by the so-called digital revolution." *Aimster,* 334 F.3d at·655.

Though *Reimerdes* is not the only case that Chamberlain cites for support, none of its other citations are any more helpful to its cause. In three other cases, *Lexmark International, Inc. v. Static Control Components, Inc.,* 253 F.Supp.2d 943, 969 (E.D.Ky.2003), *Sony Computer Entertainment America, Inc. v. Gamemasters,* 87 F.Supp.2d 976 (N.D.Cal.1999), and *RealNetworks,* 2000 WL 127311, 2000 U.S. Dist. LEXIS 1889, the trial courts did grant preliminary injunctions under the DMCA using language supportive of

Chamberlain's proposed construction. None of these cases, however, is on point. In *Lexmark*, 253 F.Supp.2d at 971, the trial court ruled that the defendant's conduct constituted copyright infringement. In *Sony*, 87 F.Supp.2d at 987, the plaintiff's allegations included both trademark and copyright infringement, and the defendant conceded that its product made "temporary modifications" to the plaintiff's copyrighted computer program. In *Real-Networks*, the defendant's product allegedly disabled RealNetworks' "copy switch," RealNetworks' technological measure designed to let the owner of copyrighted material being streamed over RealNetworks' media player either enable or disable copying upon streaming. *RealNetworks*, 2000 WL 127311, at *1, 2000 U.S. Dist. LEXIS 1889 at *1. The court stated explicitly that the avoidance of the copy switch appeared to have little commercial value other than circumvention and the consequent infringement that it enabled. *Id.* at *7, 2000 U.S. Dist. LEXIS 1889, at *21. In short, the access alleged in all three cases was intertwined with a protected right. None of these cases can support a construction as broad as the one that Chamberlain urges us to adopt, even as persuasive authority.

Furthermore, though the severance of access from protection appears plausible taken out of context, it would also introduce a number of irreconcilable problems in statutory construction. The seeming plausibility arises because the statute's structure could be seen to suggest that § 1201(b) strengthens a copyright owner's abilities to protect its recognized *rights*, while § 1201(a) strengthens a copyright owner's abilities to protect *access* to its work without regard to the legitimacy (or illegitimacy) of the actions that the accused access enables. Such an interpretation is consistent with the Second Circuit's description: "[T]he focus of subsection 1201(a)(2) is circumvention of technologies designed to *prevent access* to a work, and the focus of subsection 1201(b)(1) is circumvention of technologies designed to *permit access* to a work but *prevent copying* of the work or some other act that infringes a copyright." *Corley*, 273 F.3d at 440–41 (emphasis in original).

It is unlikely, however, that the Second Circuit meant to imply anything as drastic as wresting the concept of "access" from its context within the Copyright Act, as Chamberlain would now have us do. Were § 1201(a) to allow copyright owners to use technological measures to block *all* access to their copyrighted works, it would effectively create two distinct copyright regimes. In the first regime, the owners of a typical work protected by copyright would possess only the rights enumerated in 17 U.S.C. § 106, subject to the additions, exceptions, and limitations outlined throughout the rest of the Copyright Act— notably but not solely the fair use provisions of § 107.[14] Owners who feel that technology has put those rights at risk, and who incorporate technological measures to protect those rights from technological encroachment, gain the additional ability to hold traffickers in circumvention devices liable under § 1201(b) for putting

---

14. We do not reach the relationship between § 107 fair use and violations of § 1201. The District Court in *Reimerdes* rejected the DeCSS defendants' argument that fair use was a *necessary* defense to § 1201(a), *Reimerdes*, 111 F.Supp.2d at 317; because *any* access enables some fair uses, any act of circumvention would embody its own defense. We leave open the question as to when § 107 might serve as an affirmative defense to a prima facie violation of § 1201. For the moment, we note only that though the traditional fair use doctrine of § 107 remains unchanged as a defense to copyright infringement under § 1201(c)(1), circumvention is not infringement.

their rights back at risk by enabling circumventors who use these devices to infringe.

Under the second regime that Chamberlain's proposed construction implies, the owners of a work protected by *both* copyright *and* a technological measure that effectively controls access to that work per § 1201(a) would possess *unlimited* rights to hold circumventors liable under § 1201(a) *merely for accessing that work,* even if that access enabled *only* rights that the Copyright Act grants to the public. This second implied regime would be problematic for a number of reasons. First, as the Supreme Court recently explained, "Congress' exercise of its Copyright Clause authority must be rational." *Eldred v. Ashcroft,* 537 U.S. 186, 205 n. 10, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003). In determining whether a particular aspect of the Copyright Act "is a rational exercise of the legislative authority conferred by the Copyright Clause ... we defer substantially to Congress. It is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors ... *in order to give the public appropriate access* to their work product." *Id.* at 204–05, 123 S.Ct. 769 (citation omitted) (emphasis added). Chamberlain's proposed construction of § 1201(a) implies that in enacting the DMCA, Congress attempted to "give the public appropriate access" to copyrighted works by allowing copyright owners to deny all access to the public. Even under the substantial deference due Congress, such a redefinition borders on the irrational.

That apparent irrationality, however, is not the most significant problem that this second regime implies. Such a *regime* would be hard to reconcile with the DMCA's statutory prescription that "[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." 17 U.S.C. § 1201(c)(1). A provision that prohibited access without regard to the rest of the Copyright Act would clearly affect rights and limitations, if not remedies and defenses. Justice Souter has remarked that "[n]o canon of statutory construction familiar to me specifically addresses the situation in which two simultaneously enacted provisions of the same statute flatly contradict one another. We are, of course, bound to avoid such a dilemma if we can, by glimpsing some uncontradicted meaning for each provision." *Reno v. American–Arab Anti–Discrimination Comm.,* 525 U.S. 471, 509, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (Souter, J., dissenting). Chamberlain's proposed construction of § 1201(a) would flatly contradict § 1201(c)(1)—a simultaneously enacted provision of the same statute. We are therefore bound, if we can, to obtain an alternative construction that leads to no such contradiction.

Chamberlain's proposed severance of "access" from "protection" in § 1201(a) creates numerous other problems. Beyond suggesting that Congress enacted *by implication* a new, highly protective alternative regime for copyrighted works; contradicting other provisions of the same statute including § 1201(c)(1); and ignoring the explicit immunization of interoperability from anticircumvention liability under § 1201(f);[15] the broad policy

---

**15.** Amicus CCIA expanded on this argument in its amicus briefs to both the District Court and this court. Though the District Court found this argument at least superficially persuasive, it did not reach it. On the facts of this case, neither can we. Because § 1201(f) is an affirmative defense, it becomes relevant only if Chamberlain can prove a prima facie case and shift the burden of proof to Skylink.

implications of considering "access" in a vacuum devoid of "protection" are both absurd and disastrous. Under Chamberlain's proposed construction, explicated at oral argument, disabling a burglar alarm to gain "access" to a home containing copyrighted books, music, art, and periodicals would violate the DMCA; anyone who did so would unquestionably have "circumvent[ed] a technological measure that effectively controls access to a work protected under [the Copyright Act]." § 1201(a)(1). The appropriate deterrents to this type of behavior lie in tort law and criminal law, *not* in copyright law. Yet, were we to read the statute's "plain language" as Chamberlain urges, disabling a burglar alarm would be a per se violation of the DMCA.

In a similar vein, Chamberlain's proposed construction would allow any manufacturer of any product to add a single copyrighted sentence or software fragment to its product, wrap the copyrighted material in a trivial "encryption" scheme, and thereby gain the right to restrict consumers' rights to use its products in conjunction with competing products.[16] In other words, Chamberlain's construction of the DMCA would allow virtually any company to attempt to leverage its sales into aftermarket monopolies—a practice that both the antitrust laws, *see Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 455, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), and the doctrine of copyright misuse, *Assessment Techs. of WI, LLC v. WIREdata, Inc.,* 350 F.3d 640, 647 (7th Cir.2003), normally prohibit.

Even were we to assume arguendo that the DMCA's anticircumvention provisions created a new property right, Chamberlain's attempt to infer such an exemption from copyright misuse and antitrust liability would *still* be wrong. We have noted numerous times that as a matter of Federal Circuit law, "[i]ntellectual property rights do not confer a privilege to violate the antitrust laws. But it is also correct that the antitrust laws do not negate [a] patentee's right to exclude others from patent property." *CSU, L.L.C. v. Xerox Corp.,* 203 F.3d 1322, 1325 (Fed.Cir.2000) (citations omitted). In what we previously termed "the most extensive analysis of the effect of a unilateral refusal to license copyrighted expression," *id.,* among our sister Circuits, the First Circuit explained that: "[T]he Copyright Act does not explicitly purport to limit the scope of the Sherman Act.... [W]e must harmonize the two [Acts] as best we can." *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 36 F.3d 1147, 1186–87 (1st Cir.1994). Our previous consideration of *Data General* led us to conclude that it was "consistent with both the antitrust and the copyright laws and is the standard that would most likely be followed by the Tenth Circuit." *CSU,* 203 F.3d at 1329.

 Because nothing in Seventh Circuit law contradicts *Data General,* we similarly conclude that it is the standard that the Seventh Circuit would most likely follow. The DMCA, as part of the Copyright Act, does not limit the scope of the antitrust laws, either explicitly or implicitly. The Supreme Court

> has considered the issue of implied repeal of the antitrust laws in the context of a variety of regulatory schemes and procedures. Certain axioms of construction are now clearly established. Repeal of the antitrust laws by implication is not favored and not casually to be allowed. Only where there is a plain repugnancy between the antitrust and regulatory provisions will repeal be implied.

---

**16.** Amicus CU expanded on this policy implication in its brief to this court.

*Gordon v. N.Y. Stock Exch., Inc.*, 422 U.S. 659, 682, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975). No such "plain repugnancy" separates the DMCA from the antitrust laws—unless we adopt Chamberlain's rather extreme proposed construction of its language. The recognition that the DMCA *does not* create a new property right drives the point home even further: plaintiffs alleging DMCA liability to protect their property rights are not exempt from other bodies of law.

Finally, the requisite "authorization," on which the District Court granted Skylink summary judgment, points to yet another inconsistency in Chamberlain's proposed construction. The notion of authorization is central to understanding § 1201(a). *See, e.g.*, S. Rep. 105–90 at 28 (1998) ("Subsection (a) applies when a person has not obtained authorized access to a copy or a phonorecord that is protected under the Copyright Act and for which the copyright owner has put in place a technological measure that effectively controls access to his or her work."). Underlying Chamberlain's argument on appeal that it has not granted such authorization lies the necessary assumption that Chamberlain is entitled to prohibit legitimate purchasers of its embedded software from "accessing" the software by using it. Such an entitlement, however, would go far beyond the idea that the DMCA allows copyright owner to prohibit "fair uses . . . as well as foul." *Reimerdes*, 111 F.Supp.2d at 304. Chamberlain's proposed construction would allow copyright owners to prohibit *exclusively fair* uses even in the absence of any feared foul use. It would therefore allow any copyright owner, through a combination of contractual terms and technological

measures, to repeal the fair use doctrine with respect to an individual copyrighted work—or even selected copies of that copyrighted work. Again, this implication contradicts § 1201(c)(1) directly. Copyright law itself authorizes the public to make certain uses of copyrighted materials. Consumers who purchase a product containing a copy of embedded software have the inherent legal right to use that copy of the software. What the law authorizes, Chamberlain cannot revoke.[17]

▓▓ Chamberlain's proposed severance of "access" from "protection" is entirely inconsistent with the context defined by the total statutory structure of the Copyright Act, other simultaneously enacted provisions of the DMCA, and clear Congressional intent. *See Tidewater Oil*, 409 U.S. at 157, 93 S.Ct. 408. It "would lead to a result so bizarre that Congress could not have intended it." *Central Bank*, 511 U.S. at 188, 114 S.Ct. 1439. The statutory structure and the legislative history both make it clear that the DMCA granted copyright holders additional legal protections, but neither rescinded the basic bargain granting the public noninfringing and fair uses of copyrighted materials, § 1201(c), nor prohibited various beneficial uses of circumvention technology, such as those exempted under §§ 1201(d),(f),(g),(j). *See Reimerdes*, 111 F.Supp.2d at 323.

▓▓ We therefore reject Chamberlain's proposed construction in its entirety. We conclude that 17 U.S.C. § 1201 prohibits only forms of access that bear a reasonable relationship to the protections that the Copyright Act otherwise affords copyright owners. While such a rule of reason

---

17. It is not clear whether a consumer who circumvents a technological measure controlling access to a copyrighted work in a manner that enables uses permitted under the Copyright Act but prohibited by contract can be subject to liability under the DMCA. Because Chamberlain did not attempt to limit its customers use of its product by contract, however, we do not reach this issue.

may create some uncertainty and consume some judicial resources, it is the only meaningful reading of the statute. Congress attempted to balance the legitimate interests of copyright owners with those of consumers of copyrighted products. *See* H.R.Rep. No. 105–551, at 26 (1998). The courts must adhere to the language that Congress enacted to determine how it attempted to achieve that balance. *See Gwaltney*, 484 U.S. at 56, 108 S.Ct. 376.

As we have seen, Congress chose to create new causes of action for circumvention and for trafficking in circumvention devices. Congress did not choose to create new property rights. That is the choice that we have identified. "It is not for us to resolve the issues of public policy implicated by the choice we have identified. Those issues are for Congress." *Corley*, 273 F.3d at 458. Were we to interpret Congress's words in a way that eliminated all balance and granted copyright owners carte blanche authority to preclude all use, Congressional intent would remain unrealized.

Congress chose words consistent with its stated intent to balance two sets of concerns pushing in opposite directions. *See* H.R.Rep. No. 105–551, at 26 (1998).[18] The statute lays out broad categories of liability and broad exemptions from liability. It also instructs the courts explicitly *not* to construe the anticircumvention provisions in ways that would effectively repeal long-standing principles of copyright law. *See* § 1201(c).[19] The courts must decide where the balance between the rights of copyright owners and those of the broad public tilts subject to a fact-specific rule of reason. Here, Chamberlain can point to no protected property right that Skylink imperils. The DMCA cannot allow Chamberlain to retract the most fundamental right that the Copyright Act grants consumers: the right to use the copy of Chamberlain's embedded software that they purchased.

### G. *Chamberlain's DMCA Claim*

▆▆ The proper construction of § 1201(a)(2) therefore makes it clear that Chamberlain cannot prevail. A plaintiff alleging a violation of § 1201(a)(2) must prove: (1) ownership of a valid *copyright* on a work, (2) effectively controlled by a *technological measure,* which has been circumvented, (3) that third parties can now *access* (4) *without authorization,* in a manner that (5) infringes or facilitates infringing a right *protected* by the Copyright Act, because of a product that (6) the defendant either (i) *designed or produced* primarily for circumvention; (ii) made available despite only *limited commercial significance* other than circumvention; or (iii) *marketed* for use in circumvention of the controlling technological measure. A plaintiff incapable of establishing any one of elements (1) through (5) will have failed to prove a prima facie case. A plaintiff capable of proving elements (1) through (5) need prove only one of (6)(i), (ii), or (iii) to shift the burden back to the defendant. At that point, the various affirmative defenses enumerated throughout § 1201 become relevant.

▆▆ The District Court analyzed Chamberlain's allegations in precisely the appropriate manner—a narrow focus on Skylink's behavior, intent, and product within the broader context of longstanding expectations throughout the industry. The District Court assumed that Chamberlain met the first element, copyright

---

18. *See also* David Nimmer, *A Riff on Fair Use in the Digital Millennium Copyright Act,* 148 U. Pa. L.Rev. 673 (2000).

19. *See also Recent Cases: Copyright Law,* 114 Harv. L.Rev. 1390 (2001).

ownership, and for the purposes of its summary judgment motions accepted Chamberlain's evidence of the second element, technological access control. The District Court granted Skylink's motion for summary judgment because Chamberlain failed to meet its burden on the fourth element, the lack of authorization. Chamberlain emphatically contests this conclusion on appeal, though mostly by reiterating arguments that the District Court correctly rejected.

Chamberlain, however, has failed to show not only the requisite lack of authorization, but also the necessary fifth element of its claim, the critical nexus between access and protection. Chamberlain neither alleged copyright infringement *nor explained how the access provided by the Model 39 transmitter facilitates the infringement of any right that the Copyright Act protects.* There can therefore be no reasonable relationship between the access that homeowners gain to Chamberlain's copyrighted software when using Skylink's Model 39 transmitter and the protections that the Copyright Act grants to Chamberlain. The Copyright Act authorized Chamberlain's customers to use the copy of Chamberlain's copyrighted software embedded in the GDOs that they purchased. Chamberlain's customers are therefore immune from § 1201(a)(1) circumvention liability. In the absence of allegations of either copyright infringement or § 1201(a)(1) circumvention, Skylink cannot be liable for § 1201(a)(2) trafficking. The District Court's grant of summary judgment in Skylink's favor was correct. Chamberlain failed to allege a claim under 17 U.S.C. § 1201.

## CONCLUSION

The DMCA does not create a new property right for copyright owners. Nor, for that matter, does it divest the public of the property rights that the Copyright Act has long granted to the public. The anticircumvention and anti-trafficking provisions of the DMCA create new grounds of liability. A copyright owner seeking to impose liability on an accused circumventor must demonstrate a reasonable relationship between the circumvention at issue and a use relating to a property right for which the Copyright Act permits the copyright owner to withhold authorization—as well as notice that authorization was withheld. A copyright owner seeking to impose liability on an accused trafficker must demonstrate that the trafficker's device enables either copyright infringement or a prohibited circumvention. Here, the District Court correctly ruled that Chamberlain pled no connection between unauthorized use of its copyrighted software and Skylink's accused transmitter. This connection is critical to sustaining a cause of action under the DMCA. We therefore affirm the District Court's summary judgment in favor of Skylink.

### *AFFIRM*

### COSTS

Each party shall bear its own costs.