**Julie Amber MESSICK, Administratrix, ESTATE OF Christopher KANGAS, Deceased, Plaintiff,**

**v.**

**UNITED STATES, Defendant.**

**No. 05–697C.**

United States Court of Federal Claims.

March 27, 2006.

---

Frank W. Daly, Daly, Gorbey & O'Brien, P.C., Media, Pennsylvania, for plaintiff.

Nancy M. Kim, Trial Attorney; Todd M. Hughes, Assistant Director; David M. Cohen, Director; Peter D. Keisler, Assistant Attorney General, Department of Justice, Washington, DC, for defendant. Gregory C. Brady, Deputy General Counsel, Office of Justice Programs, of counsel.

## OPINION

HORN, Judge.

Plaintiff, Julie Amber Messick, upon behalf of her deceased son, Christopher Nicholas Kangas, filed for death benefits pursuant to the Public Safety Officers' Death Benefits Act, Omnibus Crime Control and Safe Streets Act of 1968, § 1201, as amended, 42 U.S.C. §§ 3796–3796c (2000 & Supp. II 2002) (PSOBA).

## FINDINGS OF FACT

This case involves the tragic and untimely death of Christopher Nicholas Kangas, a volunteer apprentice firefighter, also known as a volunteer junior firefighter, for the Brookhaven, Pennsylvania, Volunteer Fire Department. On May 4, 2002, Christopher was riding his bicycle to the fire station in response to a fire alarm when he was struck by

an automobile. He sustained serious injuries, including head trauma, and was flown to Children's Hospital in Philadelphia, where he died from his injuries the next day. He was fourteen years old.

In a Joint Stipulation of Facts submitted to the court, the parties have stipulated that at the time of his death, Christopher was "an officially recognized member of the Brookhaven, Pennsylvania Volunteer Fire Department, and was serving as an 'apprentice firefighter.'" Moreover, according to Brookhaven, Pennsylvania, Fire Chief Rob Montella:

> The junior firefighter is a—it's part of the team. They are just as part—just as much as a part of being a firefighter as anybody else out there. They do all the jobs that they need to do. They help out. The jobs that they do are very important. If they're not there, somebody else has to do the job. If you don't have the manpower them jobs aren't getting done. They're getting done by them other guys that are doing different jobs that they're allowed to do. So the junior firefighter is a vital part of the fire department.

Christopher had been issued official firefighter equipment. He had completed 58.5 hours of in-house training and had trained in twenty-two different areas related to firefighting, including rescue operations, the functions of an air pack, electronics, carbon monoxide detection and hose rolling. Christopher also was certified in CPR and had responded to twenty-four house drills. The Brookhaven Fire Department had authorized Christopher to be part of the firefighting team by participating at the scene of a fire, including bringing out portable equipment and fire hoses, providing food, drink and first aid to the other firefighters, and cleaning up after fires that were under control. After Christopher's death, the Brookhaven, Pennsylvania, Volunteer Fire Department added his name to the honor roll of its deceased members. Christopher was the only person on the honor roll to have died in what the Department determined was "the line of duty."

On May 28, 2002, Julie Amber Messick, Christopher's mother, filed a claim with the Bureau of Justice Assistance (BJA), for death benefits under the PSOBA. On September 11, 2002, after a review of her claim, the BJA issued an initial determination denying Mrs. Amber Messick's claim for benefits. In that initial determination, he BJA recognized that Christopher was an "Apprentice Volunteer Firefighter" and was authorized to:

> participate in training activities, provide first aid care to victims at emergency scenes, and assist with clean-up activities such as rolling hose, putting away portable tools, and removing debris under supervision of the officer in charge and outside of fire buildings and collapse zones. He was allowed to provide canteen (food service) activities and participate in a support capacity for searches, rescues, wild fires, hazardous materials incidents, and water supply operations.

However, according to the BJA determination, Christopher "was not permitted to operate equipment or assist with fire suppression at fire scenes or enter hazardous atmospheres." The BJA determined that "Apprentice VFF Kangas was a trainee but did not possess authority to act as an official firefighter." Accordingly, the BJA found that Christopher was not a "public safety officer" as defined in 42 U.S.C. § 3796b(8) [1] and that, therefore, the claimant was ineligible to receive PSOB death benefits.

On March 4, 2003, Mrs. Amber Messick appealed the BJA's initial determination. The BJA subsequently held an appeal hearing on January 22, 2004. After reviewing the documents submitted and the testimony offered by the witnesses, the Hearing Officer issued a decision on April 26, 2004, sustaining the BJA's initial determination and confirming the denial of death benefits to the claimant. The Hearing Officer made the following findings of fact:

1. On May 4, 2002, Christopher Kangas was responding to a fire call on his bicycle and he was struck by a car.

---

1. The PSOBA was amended in 2006 and the definition for "public safety officer" is now found at 42 U.S.C.A. § 3796b(9) (West, Westlaw through 2006 amendments).

He subsequently died from the injuries sustained in this accident.

2. On that date Kangas was a junior (apprentice) firefighter with the Brookhaven, Pennsylvania VFD.

3. Junior firefighter Kangas had been an active member of the volunteer fire company since May 15, 2001, when he was voted in by the Brookhaven FVD Association. He had received at least 58.5 hours of training at the time of his death. He had been issued gear and went on numerous fire calls.

4. Junior firefighter Kangas was permitted ... [2] to ride to fires on the fire truck. He was also allowed to perform various activities at the scene of the fire, including off-loading equipment, attaching non-pressurized hoses to a water source, administering first aid to victims, assisting with the canteen for the line firefighters, cleaning up (rolling hoses) and removing of debris under supervision of the fire commander. He could provide support at hazardous materials scenes but he could not participate in dealing with the hazardous materials. He could also participate in search and rescue operations.

5. Junior Firefighter Kangas was not permitted by Pennsylvania statute (43 P.S. § 48.3) and fire company regulations to operate heavy equipment, pressure hoses of any kind, ascend ladders, enter burning buildings or fire or hazardous materials zones; all of which are fundamental fire suppression activities.

The Hearing Officer concluded that Christopher was not a "firefighter" as defined in the PSOBA.[3] As is discussed more fully below, the Hearing Officer acknowledged that the PSOBA did not define "firefighter"

as one "engaged in the suppression of fires." The Hearing Officer noted that the original regulations implementing the Act had contained this language, but "[f]or unknown reasons," the language had been removed in 1985. Despite the absence of this language ("engaged in the suppression of fires") in the PSOBA, and the removal of that same language from the implementing regulations' definition of "firefighter," the Hearing Officer still concluded that an "individual must be authorized to actively engage in the suppression of fires to be a 'firefighter' under the Act." The Hearing Officer apparently did so based on his own reading of the legislative intent and what he concluded was the plain or ordinary meaning of the word "firefighter," as a " 'person who fights fires,' " for which he cited WEBSTER'S DICTIONARY (10th ed.). The Hearing Officer stated that Congress intended the word "firefighter" to be one who is "authorized to fight fires."

The Hearing Officer also cited to the definition of "line of duty" in the regulations issued pursuant to the PSOBA, which states:

> Any action which an officer whose primary function is crime control or reduction, enforcement of the criminal law, or suppression of fires is obligated or authorized by rule, regulations, condition of employment or service, or law to perform ....

28 C.F.R. § 32.2(c)(1) (2002).

In addition, the Hearing Officer relied on a Pennsylvania Statute-the Pennsylvania Child Labor Law, 43 PA. CONS. STAT. ANN. § 48.3-as limiting the ability of junior firefighters to engage in certain activities at the scene of the fires and, therefore, limiting Christopher's ability to engage in the "suppression of fires." Consequently, the Hearing Officer denied Mrs. Amber Messick's claim and concluded that Christopher was not a firefighter

---

**2.** The omitted language here read "in violation of Pennsylvania statute (43 P.S. § 48.3)." However, the Pennsylvania Bureau of Labor Law Compliance provided a clarification of the Pennsylvania Child Labor Law (CLL) in a letter which states: "It is our opinion that the CLL law does not prohibit 14- and 15-year-olds from riding fire apparatus to the scene of a fire or other emergency." Letter from Pennsylvania's Bureau of Labor Law Compliance to Edward Mann, Pennsylvania State Fire Commissioner (April 21,

2003) (on file with the court). The BJA subsequently amended its findings in its final determination to be consistent with the Pennsylvania state opinion.

**3.** The PSOBA defines firefighter as "includ[ing] an individual serving as an officially recognized or designated member of a legally organized fire department...." 42 U.S.C. § 3796b(3) (2000 & Supp. II 2002).

who died in the line of duty because "one cannot be acting in the 'line of duty' unless he or she is authorized to be engaged in the suppression of fires-in other words, to be a firefighter."

On June 29, 2004, Mrs. Amber Messick requested the BJA to reconsider the Hearing Officer's determination. On April 28, 2005, after reviewing the record, the Director of the BJA issued a Final Agency Decision, affirming the Hearing Officer's determinations and denying death benefits to the claimant. In the decision, the Director affirmed the denial of the claim, based on the conclusion that Christopher was not a public safety officer or a "firefighter" within the meaning of the PSOBA and the implementing regulations. Furthermore, the Director wrote: "Even if Christopher were a 'firefighter' within the meaning of the PSOB Act (which he was not), his tragic death did not occur in the line of duty, as defined in the PSOB regulations, because Pennsylvania law (discussed above) did not obligate or authorize him to engage in fire-fighting or fire-suppression activity."

On June 27, 2005, Mrs. Amber Messick filed a complaint in this court, seeking review of the BJA's determination. In her complaint, plaintiff states that the BJA improperly denied her benefits since it was undisputed that Christopher was serving as an officially recognized member of the Brookhaven Volunteer Fire Department at the time of his death. Further, plaintiff claims that the BJA "exceeded its regulatory powers by promulgating regulations that impermissibly narrow the definition of 'firefighter' to require that the claimant 'engaged in the suppression of fires ....' "

On September 16, 2005, in response to plaintiff's complaint, defendant filed a motion for judgment upon the administrative record. In the motion, defendant states that Congress demonstrated no intent to depart from the plain meaning of "firefighter" as one "authorized to engage in fire-fighting activities." Furthermore, even if the meaning of the word "firefighter" were found to be ambiguous, defendant argues that the BJA's interpretation of the word is reasonable and, therefore, entitled to deference. Finally, defendant reiterated that Christopher was prohibited from performing fire suppression activities by Pennsylvania State law and, thus, he did not die in the "line of duty," as defined by the BJA's implementing regulations.

This court has jurisdiction to review final decisions of the BJA pursuant to 28 U.S.C. § 1491 (2000). *See United States v. Mitchell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *Yanco v. United States,* 258 F.3d 1356, 1358–59 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 885 (2002). Plaintiff has standing to bring an action on behalf of the deceased as the sole legal parent at the time of his death pursuant to 42 U.S.C. § 3796(a)(5) (2000 & Supp. II 2002). The parties have filed cross-motions seeking judgment on the administrative record pursuant to Rule 56.1 of the Rules of the United States Court of Federal Claims (RCFC).

## DISCUSSION

■ Judicial review of BJA decisions is limited to the following inquiries:

(1) whether there has been substantial compliance with statutory requirements and with the requirements of implementing regulations;

(2) whether there has been any arbitrary or capricious action on the part of the government officials involved; and

(3) whether the decision denying the claim is supported by substantial evidence.

*Yanco v. United States,* 258 F.3d at 1362 (citing *Chacon v. United States,* 48 F.3d 508, 511 (Fed.Cir.1995)); *see also Greeley v. United States,* 50 F.3d 1009, 1010 (Fed.Cir.1995) (quoting *Morrow v. United States,* 227 Ct.Cl. 290, 296, 647 F.2d 1099, 1102, *cert. denied,* 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981)).

The Public Safety Officers' Death Benefits Act states:

In any case in which the Bureau of Justice Assistance (hereinafter in this subchapter referred to as the "Bureau") determines, under regulations issued pursuant to this subchapter, that a *public safety officer* has died as the direct and proximate result of a personal injury sustained *in the line of*

*duty,* the Bureau shall pay a benefit of $250,000, adjusted in accordance with subsection (h) of this section . . . . [4]

42 U.S.C. § 3796(a) (2000 & Supp. II 2002) (emphasis added).

The PSOBA defines *"public safety officer"* as "an individual serving a public agency in an official capacity, with or without compensation, as a law enforcement officer, as a *firefighter,* as a chaplain, or as a member of a rescue squad or ambulance crew[.]" 42 U.S.C. § 3796b(8)(A) (redesignated in 2006 as § 3796b(9)(A)) (emphasis added).

Whether a fourteen-year old "apprentice firefighter" is a "firefighter" for purposes of the PSOBA appears not to have been addressed in this circuit. Neither party has brought relevant case authority to the court's attention, nor has the court identified directly applicable case law.

The first step in statutory construction is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). The inquiry ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Id.* (quoting *Robinson v. Shell Oil Co.,* 519 U.S. at 340, 117 S.Ct. 843). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. *See TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting *Duncan v. Walker,* 533 U.S. 167, 173, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)); *Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d

389 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. *See Duncan v. Walker,* 533 U.S. 167, 121 S.Ct. 2120, 150 L.Ed.2d 251, (noting that courts should not treat statutory terms as "surplusage"). "[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 155, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976); *see also Hanlin v. United States,* 214 F.3d 1319, 1321 (Fed.Cir.), *reh'g denied* (2000).

When the statute provides a clear answer, the court's analysis is at an end. *See Barnhart v. Sigmon Coal Co.,* 534 U.S. at 450, 122 S.Ct. 941. Thus, when the "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *Johnson v. United States,* 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. Ron Pair Enterps., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))). In such instances, the court should not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d 388, 391 (Fed.Cir.) (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (noting that courts must not defer to agency interpretation contrary to the intent of Congress evidenced by unambiguous language) and *Darby v. Cisneros,* 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993)), *reh'g denied, en banc suggestion declined* (1994). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." *Weddel v.*

---

**4.** Section 3796(h) provides that: "On October 1 of each fiscal year beginning after June 1, 1988, the Bureau shall adjust the level of the benefit payable immediately before such October 1 under subsection (a) of this section, to reflect the annual percentage change in the Consumer Price Index for All Urban Consumers, published by the Bureau of Labor Statistics, occurring in the 1-year period ending on June 1 immediately preceding such October 1." 42 U.S.C. § 3796(h) (2000 & Supp. II 2002).

*Sec'y of Dep't of Health and Human Servs.*, 23 F.3d at 391 (citing *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). " '[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.' " *Shannon v. United States*, 512 U.S. 573, 583–84, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB*, 814 F.2d 697, 712 (D.C.Cir.1987)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. *See Whitfield v. United States*, 543 U.S. 209, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005) ("Because the meaning of [the statute's] text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history ...."); *Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1196 (Fed.Cir. 2004) ("Though 'we do not resort to legislative history to cloud a statutory text that is clear,' *Ratzlaf v. United States*, 510 U.S. 135, 147–48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), we nevertheless recognize that 'words are inexact tools at best, and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history.' ") (quoting *Tidewater Oil Co. v. United States*, 409 U.S. 151, 157, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972)), *reh'g and reh'g en banc denied* (2004).

"If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (footnote omitted), *reh'g denied*, 468 U.S. 1227, 105 S.Ct. 28, 29, 82 L.Ed.2d 921 (1984). The Supreme Court also has written that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (quoted in *Yanco v. United States*, 258 F.3d at 1362). The United States Court of Appeals for the Federal Circuit has found that "Congress has expressly delegated to BJA the task of promulgating regulations to implement the [Public Safety Officers' Death] Benefits Act." *Yanco v. United States*, 258 F.3d at 1362 (citing 42 U.S.C. § 3796c(a)). The regulations at issue in the case currently before the court are set forth in 28 C.F.R. §§ 32.2(c), (j) and (n) and were promulgated in exercise of that authority. See 28 C.F.R. § 32.1 (1997). "BJA's implementing regulations thus qualify for *Chevron* deference." *Yanco v. United States*, 258 F.3d at 1362.

*Chevron* deference requires that a court ask two questions when reviewing an agency's construction of a statute: First, the court must ask "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. at 842–43, 104 S.Ct. 2778. If congressional intent is clear, then the court looks no further, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778 (footnote omitted). However, if Congress is silent, or if it has left the statute "ambiguous with respect to the specific issue," the court must ask the second question: "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778 (footnotes omitted).

With respect to an agency's statutory construction: "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. 2778 (citations omitted). However, "[d]eference does not mean acquiescence." *Presley v. Etowah County Comm'n*, 502 U.S. 491, 508, 112 S.Ct. 820, 117 L.Ed.2d 51 (1991). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory

construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778 (citations omitted). Thus, this court should defer to an agency's construction of the statute if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent." *Rust v. Sullivan,* 500 U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. at 842–43, 104 S.Ct. 2778). The converse is likewise true that the court should only defer to the agency's interpretation if it is not in conflict with the congressional intent.

■ Plaintiff asserts that because Christopher was an officially recognized member of the Brookhaven, Pennsylvania, Volunteer Fire Department, he should be considered a public safety officer and "firefighter" pursuant to the statute for all purposes, including death benefits. Defendant responds that being a member of a "legally organized fire department" is a necessary, but not a sufficient condition to being a "firefighter." According to the defendant, to be eligible for death benefits, Christopher also must fit the statutory definition of "firefighter" according to the plain meaning of the word, and the definition of "line of duty" in the implementing regulations.

The PSOBA definition of the term "firefighter" states: "firefighter" "includes *an* individual serving as an officially recognized or designated member of a legally organized volunteer fire department...."[5] 42 U.S.C. § 3796b(4) (emphasis added). It is a broad and encompassing definition included in a death benefits statute intended to compensate grieving family members, in small part, for their loss. The BJA regulations written to implement the PSOBA similarly state that: "*Firefighter* includes *any* individual serving as an officially-recognized or desig-

nated member of a legally-organized volunteer fire department." 28 C.F.R. § 32.2(n) (2002) (emphasis added). The only difference between the statute and the implementing regulation in the definition of "firefighter" is a one-word change from "*an* individual serving as an officially recognized or designated member of a legally organized volunteer fire department" in the statute to "*any* individual serving as an officially recognized or designated member of a legally organized volunteer fire department" in the regulations. Neither the statute nor the regulations apply age or duty requirements, or add other limitations to the definition of the term firefighter.

The key words chosen by the legislators in the PSOBA definition of "firefighter" are "*includes* an individual." The drafters of the statute did not choose to employ such terms as "*means*" or "*is defined as.*" The PSOBA also defines the term "chaplain" to "include[ ] any individual serving as an officially recognized or designated member of a legally organized volunteer fire department ...." 42 U.S.C. § 3796b(2). In contrast, other definitions in 42 U.S.C. § 3796b consciously do use the word "means" to define the terms "child," "law enforcement officer," "member of a rescue squad or ambulance crew," and "public safety officer." 42 U.S.C. §§ 3796b(2)-(9). Therefore, when Congress chose to use the word "includes" rather than a term such as "means" or "is defined as" in reference to "firefighter" and "chaplain," Congress signaled a broader, more expansive interpretation as appropriate to understand the terms "firefighter" and "chaplain." The terms "firefighter" and "chaplain" are appropriately considered umbrella terms for those officially recognized or designated as individuals serving in an organized fire department. *See* 42 U.S.C. § 3796b(2),(4). The absence of a more specific definition in section 3796b of the term "firefighter" indicates that Christopher's age and more limited duties within the Brookhaven, Pennsylvania, Volunteer Fire

---

5. The definition of firefighter in 2002 also included "an officially recognized or designated public employee member of a rescue squad or ambulance crew." 42 U.S.C. § 3796b(4) (2000 & Supp. II 2002). Congress removed this language

by amendment in 2006 and added section 3796b(7), which defined "member of a rescue squad or ambulance crew" separately from a firefighter. Pub.L. No. 109–162, 199 Stat. 2160 (2006).

Department do not eliminate his categorization as a "firefighter" under the statute. Furthermore, the age restrictions on duties allowed to be performed are imported into the case, as discussed more fully below, from the Pennsylvania Child Labor Law, not the federal statute. Moreover, the Pennsylvania statute sets no limitations on categorization of an individual as a firefighter, but only addresses limits on tasks which a minor "firefighter," is permitted to perform in Pennsylvania. In fact, the Pennsylvania statute, which sets those limitations, specifically begins the statutory section with the words "Minors who are members of a volunteer fire company." 43 PA. CONS. STAT. ANN. § 48.3 (West 2006).

Since Congress chose not to define "firefighter" more specifically, the court addresses the ordinary, plain meaning of the word. *Williams v. Taylor*, 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) ("We give the words of a statute their 'ordinary, contemporary, common meaning,' absent an indication Congress intended them to bear some different import.") (quoting *Walters v. Metro. Ed. Enters., Inc.*, 519 U.S. 202, 207, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993))). Defendant argues that the word "firefighter" means a "person who fights fires," CITING MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed.2002). Although there are undoubtedly many somewhat different dictionary definitions of the word "firefighter," even the defendant's own dictionary choice would not exclude Christopher as one who "fights fires."

The language of the PSOBA clearly does not limit death benefits eligibility according to duties performed at the scene of a fire; nor do the legislative history of the Act or the words of the regulations. None of these indicate that engaging in front-line activities is a component of "firefighting" or "suppression of fires." In 1975, when the statute was first drafted to include firefighters, the PSO-BA was originally introduced as House Resolution 365, which defined "eligible firefighter" as one who was "actually and directly engaged in fighting a fire[.]" H.R. 365, 94th Cong. (1975). The Senate version of the bill, however, did not include this requirement, but described a "fireman" as "includ[ing] a person serving as an officially recognized or designated member of a legally organized volunteer fire department[.]" S. 2572, 94th Cong. (1975). Any language requiring a firefighter to be authorized to engage directly in the fighting of fires was omitted from the final version of the Act.[6] In fact, the Joint Explanatory Statement of the Conference Committee specifically chose to follow the Senate's description of "fireman" and authorized payment "for all line of duty deaths" and not just those sustained "while actually and directly engaged in fighting fires or in other activities determined by the Law Enforcement Assistance Administration to be potentially dangerous." H.R. REP. No. 94–1501, at 5–6 (1976). The words of the statute and the regulations are easily understood without adding duty-specific limitations, which, contrary to any congressionally expressed intent, would eliminate some eligible "firefighters" from death benefits. Defendant, therefore, fails to demonstrate that in the legislation passed, Congress intended to limit coverage to firefighters who directly place themselves in danger when fighting fires. In fact, in the defendant's response brief, the defendant even concedes at one point that the proper test for coverage is the person's authority to act as a firefighter, law enforcement officer, or chaplain, not whether the person is involved in an inherently dangerous activity.[7]

Additionally, and of interest, in 2002, Congress amended the PSOBA to include chap-

---

6. As noted above, the final version of the Public Safety Officers' Death Benefits Act of 1976 states: "'fireman' includes a person serving as an officially recognized or designated member of a legally organized volunteer fire department[.]" H.R. 366, 94th Cong. (1976) (enacted).

7. The defendant's counsel wrote: "Again, Mrs. Amber–Messick errs by failing to recognize that the proper test for coverage under the Act is the person's authority to act as a firefighter, or law enforcement officer, or chaplain, *etc.*, not whether the person is engaging in an inherently dangerous activity." (emphasis in original).

lains as public safety officers.[8] Pub.L. No. 107–196, 116 Stat. 719 (2002). The term "chaplain" under the PSOBA "includes[9] any individual serving as an officially recognized or designated member of a legally organized volunteer fire department or legally organized police department, or an officially recognized or designated public employee of a legally organized fire or police department who was responding to a fire, rescue, or police emergency." 42 U.S.C. § 3796b(2). Moreover, the plain meaning of the word "chaplain" does not require such an individual to fight fires or enforce laws.[10] By including chaplains as public safety officers along with firefighters and law enforcement officers, Congress expanded the eligibility for PSOBA benefits to include a larger group of individuals, such as chaplains, who clearly are not directly engaged in the suppression of fires and crime prevention activities. Since chaplains need not be authorized to engage in firefighting or crime preventing activities, or place themselves in danger while at a fire or crime scene, or even participate in firefighter or anti-crime activities, allowing recovery only to individuals authorized to engage in specifically hazardous activity (thereby excluding Christopher) impermissibly restricts the scope of the statute. Moreover, inasmuch as the BJA's regulation, 28 C.F.R. § 32.2(c) (2002), requires public safety officers to have their "primary function" as fire suppression or enforcement of the criminal law, the regulation is internally inconsistent, and therefore disregarded, since the primary function of a chaplain is neither suppression of fires or law enforcement and yet chaplains are still entitled by statute to recover.

Although there are many tasks involved in firefighting, defendant's counsel tries to narrow the definition of the term "firefighter."

Consistent with the conclusions of the BJA, defendant's counsel again asserts that in order to be a "firefighter," one must have the authority to engage in the "suppression of fires," which the defendant argues excluded Christopher due to the restrictions on his activities based on Pennsylvania law. In order for Christopher to be an apprentice firefighter, his activities had to conform with the Brookhaven Fire Company's Rules and Regulations for Apprentice Firefighters. Those rules and regulation state that "[a]pprentice firefighters must abide by all rules and regulations, standard operating procedures of the Brookhaven Fire Company and the Child Labor Laws of the State of Pennsylvania." The Pennsylvania's Child Labor Law, with respect to minors and volunteer fire companies, states:

(a) *Minors who are members of a volunteer fire company* and volunteer forest fire crew may participate in training and firefighting activities as follows:

(1) Drivers of trucks, ambulances or other official fire vehicles must be eighteen years of age.

(2) Minors sixteen and seventeen years of age who have successfully completed a course of training equal to the standards for basic fire-fighting established by the Department of Education and the Department of Environmental Resources, may engage in fire-fighting activities provided that such minors are under the direct supervision and control of the fire chief, an experienced line officer or a designated forest fire warden.

(3) No person under eighteen years of age shall be permitted to (i) operate an aerial ladder, aerial platform or hydraulic jack, (ii) use rubber electrical gloves, insulated wire gloves, insulated wire cutters, life nets or acetylene cutting units, (iii) operate

---

**8.** Congress also included members of rescue squads and ambulance crews as public safety officers in 1986. Pub.L. 99–591, 100 Stat. 3341 (1986).

**9.** As discussed above, when Congress has used the term "includes" to describe a public safety officer, it did not specifically define the term.

**10.** The Merriam–Webster Online Dictionary defines chaplain as "1: a clergyman in charge of a

chapel [;] 2: a clergyman officially attached to a branch of the military, to an institution, or to a family or court[;] 3: a person chosen to conduct religious exercises (as at a meeting of a club or society)[;] 4: or a clergyman appointed to assist a bishop (as at a liturgical function)." MERRIAM-WEBSTER ONLINE DICTIONARY, *available at* http://www.m-w.com/dictionary/chaplain (as of March 24, 2006).

the pumps of any fire vehicle while at the scene of a fire, or (iv) enter a burning structure.

(b) The activities of minors under sixteen years of age shall be limited to:

(1) Training.

(2) First aid.

(3) Clean-up service at the scene of a fire, outside the structure, after the fire has been declared by the fire official in charge to be under control.

(4) Coffee wagon and food services.

(c) In no case, however, shall minors under sixteen years of age be permitted to:

(1) Operate high pressure hose lines, except during training activities;

(2) Ascend ladders, except during training activities; or

(3) Enter a burning structure.

(d) All other activities by minors who are members of a volunteer fire company or a volunteer forest fire crewman shall be permissible unless specifically prohibited by this act.

43 PA. CONS. STAT. ANN. § 48.3 (West 2006) (footnote omitted; emphasis added).

Initially, as the court noted above, section (a) of the Pennsylvania statute begins with the phrase, "minors who are members of a volunteer fire company," thereby acknowledging as a given that minors can be "members of a volunteer fire company." Defendant argues, however, that "[a]s a fourteen-year old, under Pennsylvania law, he [Christopher] could not engage in *any* firefighting activities; his activities were limited to training, first aid, clean-up, and food services. These activities cannot be considered firefighting activities, as firefighting is understood in its ordinary and common usage." (emphasis in original). Interestingly, the description of Christopher's firefighting duties offered by the BJA in its initial denial of the claimant's original claim is more expansive than the definition the defendant's counsel now offers to this court. The BJA's initial denial stated:

> The activities permitted by the position description for apprentice volunteer firefighters submitted by the fire company allowed minors 14 and 15 years old (including Apprentice VFF Kangas) to participate in training activities, provide first aid care to victims at emergency scenes, and assist with clean-up activities such as rolling hose, putting away portable tools, and removing debris under supervision of the officer in charge and outside of fire buildings and collapse zones. He was allowed to provide canteen (food service) activities and participate in a support capacity for searches, rescues, wild fires, hazardous materials incidents, and water supply operations.

Similarly, the definition of Christopher's firefighting duties included in the BJA Hearing Officer's report also is broader than the defendant's counsel's current description to this court.

> 4. Junior firefighter Kangas was permitted ... to ride to fires on the fire truck. He was also allowed to perform various activities at the scene of the fire, including off-loading equipment, attaching non-pressurized hoses to a water source, administering first aid to victims, assisting with the canteen for the line firefighters, cleaning up (rolling hoses) and removing of debris under supervision of the fire commander. He could provide support at hazardous materials scenes but he could not participate in dealing with the hazardous materials. He could also participate in search and rescue operations.

Defendant also cites to three other definitions of firefighter in unrelated federal statutes and regulations in support of its position. First, defendant cites to the Fair Labor Standards Act (FLSA) of 1938 which defines "Employee in fire protection activities" as "an employee, including a firefighter ... who is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department ...; and (2) is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk." 29 U.S.C. § 203(y) (2000). As discussed above, Christopher had the legal authority to be part of a team that engaged in fire

suppression. Moreover, this FLSA definition is inapposite as it deals only with *employees* of public agencies and specifically "does not include any individual who volunteers to perform services for a public agency ...." 29 U.S.C. § 203(4)(A). Next, defendant cites to the Federal Employees Retirement System which defines firefighter as "an employee occupying a rigorous position, whose primary duties are to perform work directly connected with the control and extinguishment of fires ...." 5 C.F.R. § 842.802 (2005). Again, this definition deals with employees, not volunteers, and similarly defines firefighters for purposes of pay and retirement benefits eligibility. Moreover, regardless of definitions chosen by Congress in the FLSA or in a federal retirement statute, the PSOBA definition of the term "firefighter" is not limited by duties to be performed.

Finally, defendant cites to the Federal Emergency Management Agency (FEMA), Department of Homeland Security Fire Prevention and Control Assistance to Firefighters Grant Program, which defines "active firefighter" as "a member of a fire department or organization in good standing that is qualified to respond to and extinguish fires or perform other fire department emergency services and has actively participated in such activities during the past year." 44 C.F.R. § 152.2 (2005). The agency opinions issued by the BJA agree that Christopher was a member of a fire department in good standing and was qualified to perform certain fire department response and other emergency services. This third alternative definition applicable to FEMA, contrary to defendant's position, appears to include Christopher as a firefighter based on his status as a "member of a fire department in good standing that is qualified to ... perform other fire department emergency services."

Aside from defendant's bald assertion that Christopher's responsibilities "cannot be considered firefighting activities, as firefighting is understood in its ordinary and common usage," defendant fails to demonstrate how Christopher's authorized duties do not constitute important functions of "fire suppression" by the Brookhaven, Pennsylvania, Volunteer Fire Department team. Nothing in the dictionary definition or statutory language requires a "firefighter" to be authorized to enter burning buildings, or describes how deeply and how soon an individual must penetrate a fire scene to qualify as a firefighter.

As a member of the Brookhaven, Pennsylvania, Volunteer Fire Department, Christopher was authorized to attend the scene of a fire. Although he was not authorized to hold a high pressure hose or run into a burning building, consistent with the Pennsylvania statute, he was authorized to perform a variety of critical firefighting functions at the scene of uncontrolled fires. As testified to by the Brookhaven Fire Chief, without the assistance of volunteer firefighters like Christopher, those firefighters entering uncontrolled, burning buildings would not have had the same resources available at the scene of a fire. Christopher was part of a team dedicated to the suppression of fires and control of fire scenes. That team depended on the contributions from each member of the team, including junior firefighters, so that the other members of the team also could carry out their responsibilities. As the BJA's predecessor, the Law Enforcement Assistance Administration, pointed out in 1977 when the implementing regulations of the PSOBA were in their promulgation phase: "[E]ven those officers performing desk assignments are primarily involved, even though indirectly, in ... firefighting." 42 Fed.Reg. No. 88 at 23252 (May 6, 1977).[11] The same principle operates in any corpora-

---

11. The preamble to the rule, however, does contain somewhat inconsistent language: "Because LEAA believes the broad concept of making coverage dependant on the officer's authority should be applied to firefighters as well, the proposed definition of 'firefighter' has been amended to include 'all fire service personnel *authorized to engage in the suppression of fires*, including any individual serving as an officially-recognized or designated member of a legally-organized volunteer fire department' (amendment emphasized)." *Id.* (citing 28 C.F.R. § 32.2(j) (1977)). As noted above, however, the concept of "suppression of fires" was removed from the regulatory definition of "firefighter" prior to the time of Christopher's death and has not been reincorporated in the regulations except in the definition of "line of duty."

tion or government agency, including the military.

In conclusion, Christopher was a recognized apprentice "firefighter" of the Brookhaven Volunteer Fire Department. He was authorized to attend the scene of a fire, offload equipment, attach non-pressurized hoses to water sources, administer first-aid to victims, assist in food services, roll hoses after a fire, remove debris, provide support at hazardous material scenes, and participate in search and rescue operations. Christopher engaged in activities involved in the "suppression of fires." He was a "firefighter" in the ordinary sense of the word. Therefore, this court concludes that the BJA decisions, which did not recognize Christopher as a "firefighter," were unreasonable, arbitrary and capricious. The BJA's interpretation was unreasonably and impermissibly restrictive in light of the language of the PSOBA.

█ Defendant also argues that because Christopher was not authorized to engage in fire suppression, he did not die in the "line of duty." The PSOBA states that to be eligible for death benefits under the statute, a public safety officer must have died "as the direct and proximate result of a personal injury sustained in the line of duty[.]" 42 U.S.C. § 3796(a). The PSOBA does not contain a definition for the term "line of duty" nor does it contain the words "suppression of fires." The House and Senate Conference Committee prior to the enactment of the PSOBA concluded that "the 'line of duty' is a well established concept and that it is appropriate to extend coverage to *all* acts performed by the public safety officer in the discharge of those duties which are required of him in his capacity as a law enforcement officer or as a fireman." H.R. REP. No. 94–1501, at 6 (1976) (emphasis added).

The implementing regulations to the PSOBA define "line of duty" as follows:

(c) *Line of duty* means:

(1) Any action which an officer whose primary function is crime control or reduction, enforcement of the criminal law, or *suppression of fires* is obligated or authorized by rule, regulations, condition of employment or service, or law to perform, including those social, ceremonial, or athletic functions to which the officer is assigned, or for which the officer is compensated, by the public agency he serves. For other officers, "line of duty" means any action the officer is so obligated or authorized to perform in the course of controlling or reducing crime, enforcing the criminal law, or suppressing fires[.]

28 C.F.R. § 32.2(c)(1) (2002) (emphasis added).

As described above, as a junior firefighter, Christopher's primary function was to be part of the team that engaged in "the suppression of fires." He was authorized to ride in fire engines to the scene of a fire. At the scene of a fire, Christopher was tasked with laying out and attaching fire hoses to water sources, maintaining equipment when not in use, and providing a variety of other services at the scene of a fire. His "primary function," like those directing the hoses on the fires or rushing into burning buildings, was "the suppression" of fires. The court concludes that the decisions by the BJA which impermissibly limited the definition of "line of duty" under the statute and, therefore, denied death benefits to the plaintiff, were arbitrary and capricious and founded on an unreasonably restrictive reading of the words of the PSOBA and the implementing regulations. In sum, Christopher met the PSOBA and regulatory tests for death benefits eligibility as a "firefighter" who died in the "line of duty."

Finally, the fact that Christopher was en route to a fire and not at the scene does not preclude plaintiff from recovery. The court in *Davis v. United States,* 46 Fed.Cl. 421 (2000) adopted an "on duty" standard for recovery, *id.* at 426, and held that a police officer did not have to be "acting to intervene in a law enforcement capacity" to be "in the line of duty" under the PSOBA, *id.* at 427. In *Davis v. United States,* the officer had left work early before his shift ended and was struck by another car which was fleeing another police officer. *Id.* at 422. In the instant case, Christopher was responding to and on his way to a fire alert when he was struck by a car. Christopher was "in the line of duty" while responding to a fire.

## CONCLUSION

For the foregoing reasons, the court finds that pursuant to section 3796(a) of the Public Safety Officers' Death Benefits Act and the implementing regulations, Christopher Kangas died "in the line of duty" and was a "firefighter" authorized to be at a fire scene and perform duties as part of a team engaged in "the suppression of fires" at the time of his death. Therefore, the BJA's decision to deny benefits to Christopher Kangas was an arbitrary exercise of its authority. Plaintiff's motion for judgment on the administrative record is **GRANTED**, and defendant's cross-motion is **DENIED**. The Clerk of the Court is directed to enter **JUDGMENT** in the amount of $250,000.00, adjusted in accordance with 42 U.S.C. § 3796(h), in favor of the plaintiff.

**IT IS SO ORDERED.**